# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MIGUEL APONTE AND
AMADO CORREA, on behalf of themselves and
all similarly situated individuals,

      Plaintiffs,

    v.

COMPREHENSIVE HEALTH
MANAGEMENT, INC.,

      Defendant.

Case No.:  10-cv-4825 (PKC)

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION
## FOR CLASS CERTIFICATION

JACKSON LEWIS LLP

666 Third Avenue
New York, New York 10017
Telephone:  (212) 545-4000
Facsimile:  (212) 972-3213

2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland  21209
Telephone:  (410) 415-2000
Facsimile:  (410) 415-2001

Attorneys of Record:
Peter C. Moskowitz, Esq.
Jason A. Zoldessy, Esq.
Emmett F. McGee, Jr., Esq. (admitted *pro hac vice*)
Paul A. Mallos, Esq. (admitted *pro hac vice*)

## TABLE OF CONTENTS

TABLE OF AUTHORIITES ............................................................................................ iii-iv

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 3

I.   CHMI'S BUSINESS ............................................................................................ 3

    A.   CHMI's Segmented and Decentralized Organizational Structure ............................................. 4

    B.   Medicare Sales And Medicaid Sales ............................................................................... 4

II.  THE PLAINTIFFS AND OPT-INS ............................................................................. 5

III. BENEFIT CONSULTANTS ARE SALES ASSOCIATES ............................................... 5

IV.  WHILE SALES ASSOCIATES' PRIMARY DUTY IS SELLING WELLCARE HEALTH
    PLANS, THE MANNER IN WHICH THEY DO SO VARIES SIGNIFICANTLY ..................... 7

ARGUMENT ............................................................................................................ 9

I.   PLAINTIFFS' NEW YORK LABOR LAW CLAIMS SHOULD NOT BE CERTIFIED AS
    CLASS CLAIMS BECAUSE PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS
    OF FED. R. CIV. P. 23 ............................................................................................... 9

    A.   Plaintiffs Cannot Satisfy The Commonality Requirement Of Rule 23(a) .............................. 10

        1.   The Cookie-Cutter And Unsupported Declarations Offered By Plaintiffs' Motion Do
            Not Establish Common Circumstances Warranting a Class Action And Are Directly
            Contradicted By The Deposition Testimony Of The Plaintiffs And Opt-Ins ....................... 11

        2.   Different Sales Associates Performed Different Job Duties ................................................ 12

        3.   Sales Associates Spent Different Amounts Of Time In A CHMI Office .............................. 15

        4.   Different Sales Associates Worked At Different Types Of Locations .................................. 15

        5.   Some Sales Associates Engaged In Street Sales While Others Did Not, And This
            Changed Over Time And Varied By Location ................................................................ 16

        6.   The Nature And Levels Of Supervision Varied Among Sales Associates ........................... 17

        7.   Compensation Policies And Structures Differed Based On The Nature Of The
            Product Sold As Well As When And Where The Sales Associate Worked .......................... 18

        8.   Different Sales Associates Received Different Sales Training ............................................. 19

9.  Sales Associates Had Different Selling Periods ................................................... 20

10.  Different Legal Issues Apply To Different Individuals ........................................ 20

(a)  Outside Sales Versus Administrative Exemption .................................... 20

(b)  Certain Sales Associates Released Their Claims In Exchange for Severance ............. 21

B.  Plaintiffs Cannot Satisfy The Typicality Requirement Of Rule 23(a) .................................... 21

C.  Plaintiffs Cannot Satisfy The Adequacy Of Representation Requirement Of Rule 23(a) ........ 23

D.  Plaintiffs Cannot Satisfy The More Rigorous Requirements of Rule 23(b) ............................ 24

1.  Individual Questions Predominate Over Common Issues ..................................... 24

2.  The Proposed Class Action Is Not Superior To Individual Actions ...................................... 26

CONCLUSION ............................................................................................................................... 27

## TABLE OF AUTHORITIES

### FEDERAL CASES

Amechme Products, Inc. v. Windsor,
521 U.S. 591 (1997)........................................................................................................9

Cordes & Co. Finance Services, Inc. v. A.G. Edwards & Sons, Inc.,
502 F.3d 91 (2d Cir. 2007)..............................................................................................9

Dauphin v. Chestnut Ridge Transp., Inc.,
06 Civ. 2730 (SHS), 2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2009).................................23

Deboissiere v. American Modification Agency,
09-CV-2316 (JS) (MLO), 2010 U.S. Dist. LEXIS 113776 (E.D.N.Y. Oct. 22, 2010).......................25

Diaz v. Electronics Boutique of America,
04-CV-0840E, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005).........................................10

DiFilippo et al., v. Barclays Capital, Inc.,
552 F. Supp. 2d 417 (S.D.N.Y. 2008)............................................................................21

Dunnigan v. Metropolitan Life Insurance Co.,
214 F.R.D. 125 (S.D.N.Y. 2003).............................................................................22, 24, 26

Edwards v. Publishers Circulation Fulfillment,
268 F.R.D. 181 (S.D.N.Y. 2010).....................................................................................11

Eng-Hatcher v. Sprint Nextel Corp.,
07 Civ. 7350  (BSJ), 2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009)..............................10

General Telephone Co. of Southwest v. Falcon,
457 U.S. 147 (1982)........................................................................................................22

Hendricks v. Minzie,
263 F.R.D. 78 (D. Conn. 2009)........................................................................................25

Karvaly v. eBay, Inc.,
245 F.R.D. 71 (E.D.N.Y. 2007).......................................................................................10

Kopera v. Home Depot,
09 Civ. 8337 (WHP), 2011 U.S. Dist. LEXIS 3382 (S.D.N.Y. Jan. 11, 2011).................................25

Moore v. PaineWebber, Inc.,
306 F.3d 1247 (2d Cir. 2002)...........................................................................................10

Myers v. Hertz Corp.,
624 F.3d 537 (2d Cir. 2010)........................................................................................9, 24-25

Noble v. 93 University Place Corp.,
224 F.R.D. 330 (S.D.N.Y. 2004) ...................................................................................................23

Pecere v. Empire Blue Cross and Blue Shield,
194 F.R.D. 66 (E.D.N.Y. 2000) ............................................................................................ 10, 26

Potchin v. Prudential Home Mortg. Co.,
No. 97-CV-525 (CBA), 1999 U.S. Dist. LEXIS 22480 (E.D.N.Y. Nov. 12, 1999) ............................26

## PRELIMINARY STATEMENT

Defendant Comprehensive Health Management, Inc. ("Defendant" or "CHMI") submits this memorandum of law in opposition to Plaintiffs Miguel Aponte's and Amado Correa's ("Plaintiffs") motion seeking to certify their New York Labor Law ("NYLL") unpaid overtime claims as a class action pursuant to Federal Rule of Civil Procedure 23.[1]   In addition to this motion, Plaintiffs also have filed a concurrent motion to certify this case as a collective action under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), which Defendant has opposed in an accompanying Opposition.

Plaintiffs, former CHMI Sales Associates, seek to certify a class of all "Benefit Consultants" employed by CHMI in the State of New York during the six years immediately preceding the initiation of this lawsuit. The putative class would include all CHMI employees who sell or sold WellCare health plans to Medicare or Medicaid eligible individuals, regardless of the positions they held or the duties they performed; the different products they sold; the different ways they sold the products; the different regulatory requirements that applied to the sale of those products; how they were paid; or the compensation plans that applied to them.

Due to the individualized nature of the claims asserted on behalf of the putative class members this case is not appropriate for class certification.  Specifically, Plaintiffs cannot establish that common questions of law and fact exist among the putative class members. Indeed, due to their specific duties and responsibilities, which were limited to selling Medicare health plans to residents of Spanish-speaking neighborhoods in New York City for less than two years, they cannot adequately represent the claims of the putative class encompassing the entire state of New York over six years.  Moreover, there is insufficient evidence that Plaintiffs' claims are typical of the class.  Further, Plaintiffs' assertion that this case is appropriate for class action treatment necessarily fails because they cannot meet their burden

---

[1]    New York prohibits class certification of statutory claims seeking liquidated damages where the substantive statute at issue does not authorize class actions.  (CPLR § 901(b)).  Should the Court certify the class, Plaintiffs and any members who do not opt out of the class, thereby waive any statutory right to recover liquidated damages.

of establishing that questions of law or fact common to class members predominate over questions affecting only individual members.   The determination of whether each member of the putative class was properly classified as exempt requires an individualized assessment of each individual's actual duties and the manner in which they were performed.   To make this determination the Court will be required to assess whether each person was engaged in selling health plans, how they went about performing their jobs, how much time they spent each day selling health plans, whether they were selling the health plans from within or outside an office of Defendant, how they were compensated, and for some, the level of discretion and independent judgment they exercised.

Defendant has taken an abbreviated deposition of the two Plaintiffs and four of the Opt-Ins.[2] Defendant's Opposition is based largely on the deposition testimony of the Plaintiffs and the Opt-Ins themselves.  As reflected in their deposition testimony, although the putative class members all had the primary duty of making sales and enrolling individuals in one of the insurance plans offered by CHMI, their jobs otherwise differed in a variety of material respects relevant to the Court's inquiry as to whether they were properly classified as exempt including:

- Different Job Functions – depending on the products they sold as well as different regulations governing the sales of the products;

- Different Responsibilities for Generating and Following up on Sales Leads – including utilizing doctor's offices, pharmacies, prospecting their own leads, or receiving leads from supervisors;

- Different Amounts of Time Spent in Defendant's offices - some almost never came to the office, some worked at home, others worked out of roving recreational vehicles ("RVs");

- Different Compensation Policies and Structures – depending on the product they sold and where they worked;

---

[2]   For consistency and ease of reference, and understanding that the FLSA's "opt-in" provisions are inapplicable to a Rule 23 class action, Defendant herein refers to those individuals who have consented to join the FLSA component of this lawsuit as "Opt-Ins."

- <u>Different Daily Tasks</u> – some engaged in street sales, telemarketing and/or what they characterized as customer service-related activities, but others did not;

- <u>Different Amounts of Time Spent on Non-Sales Activities</u> – depending on product and geography; and/or

- <u>Different Legal and Factual Issues</u> - depending on whether the administrative exemption is applicable and whether they signed releases.

Furthermore, the nature of the sales function and the way the products were sold, as well as the manner in which Sales Associates were compensated and how their job performance was measured, also varied over time. As such, the same questions of law and fact are not common to a Sales Associate employed in 2006 and a Sales Associate employed in 2010, even if they sold the same products and worked in the same market. The deposition testimony of the Plaintiffs and Opt-Ins also demonstrates that their job duties and how they went about performing their jobs also differed significantly from other Sales Associates who worked at the same time, selling the same products in the same markets. As Plaintiff Amado Correa testified, "different reps worked differently." (See **Appendix 1**, Deposition of Amado Correa ("Correa depo."), at 56)

Plaintiffs' Motion relies largely on cookie-cutter Declarations from the Plaintiffs and Opt-Ins. Not only are those Declarations conclusory and unsupported, but they are directly contrary to the sworn deposition testimony of the Plaintiffs and Opt-Ins. Plaintiffs' Motion should be denied.

## STATEMENT OF FACTS

The facts relevant to this Motion are summarized below and in Section I of the Argument, which details the differences between the putative class members that the Court will need to assess in order to determine whether each member was properly classified as exempt.

## I.  CHMI'S BUSINESS

CHMI is a third-party administrator and is indirectly owned by WellCare Health Plans, Inc. The WellCare group of companies ("WellCare") provides managed care services exclusively for

3

government-sponsored health care programs focusing on Medicare and Medicaid.  WellCare offers a variety of health plans for families, children, the aged, blind, and disabled.  WellCare operates Medicaid and Medicare health plans in New York.  (See **Appendix 2,** Deposition of Robert Beck ("Beck depo."), at 12)[3]  CHMI employs the sales force responsible for selling various WellCare health plans to Medicare- and Medicaid-eligible individuals.  (Beck depo. 8-9)  WellCare also contracts with independent insurance agents to sell its Medicare health plans. (Beck depo. 71)

### A.      CHMI's Segmented and Decentralized Organizational Structure

CHMI's New York operation is organized into different markets based on geography (Upstate versus Downstate), and is further divided between Medicare and Medicaid sales.  (Beck depo. 11-12)  New York City and Syracuse, for example, are in two distinct markets.  Each market is considered a separate business unit, with its own distinct budget, cost structure, profit and loss responsibility, and management structure.  (Beck depo. 11)  Within a particular market, the Sales Associates are organized into different "sales teams" that are supervised by a "Sales Manager."  The Sales Managers in turn report to the "Sales Director" for the market.  (Beck depo. 58)

### B.      Medicare Sales And Medicaid Sales

Although CHMI offers both Medicare and Medicaid products in New York, the Medicaid Sales organization in the Upstate and Downstate markets is separate and distinct from the Medicare Sales organization in the Upstate and Downstate markets.  (Beck depo. 51-52; see also **Appendix 3**, Deposition of Justin Frazer ("Frazer depo."), at 13, 20)  Medicaid Sales Associates report to different Sales Managers and Sales Directors than Medicare Sales Associates.  (Correa depo. 79-80, 90-91; see also **Appendix 6,** Deposition of Miguel Aponte ("Aponte depo."), at 49, 53, 71-72, 78)  Medicaid Sales Associates are not authorized to sell Medicare products and enroll people in Medicare

---

[3]      Robert Beck is WellCare's Vice President for Sales and Marketing Operations.  (Beck depo. 5-7)

health plans, and Medicare Sales Associates are not authorized to sell Medicaid products and enroll people in Medicaid plans.  (Correa depo. 87; see also **Appendix 4,** Deposition of Opt-In Francisca Alcantara ("Alcantara depo."), at 66-67; **Appendix 5,** Deposition of Opt-In Maria Fernandez ("Fernandez depo."), at 24, 36, 68-69)  Because Medicaid sales is regulated by state and local laws, the sales activities of Medicaid Sales Associates in New York City are subject to separate and additional regulatory requirements that do not apply to Medicare Sales Associates in New York City or to Medicaid Sales Associates in Upstate New York.  (Frazer depo. 13-20; Beck depo. 48-52)

## II.     THE PLAINTIFFS AND OPT-INS

Plaintiffs both worked as Sales Associates in New York City, selling exclusively Medicare insurance products, primarily to Spanish-speaking immigrants in predominately Hispanic neighborhoods. (Correa depo. 68-69, 86-87, 99-100; Aponte depo. 60, 67-68, 81)  Plaintiffs were employed for only relatively short periods of time, in comparison to the six-year period they seek to cover in this action.   Aponte was employed from May 12, 2008 to April 1, 2009; and Correa was employed from July 29, 2007 to June 1, 2009.  (See Aponte and Correa Declarations, attached as Exhibits E and F to Plaintiff's Motion, at ¶ 4)

In addition, nearly all of the individuals who have opted in to this case to date (the "Opt-Ins"), including deponents Francisca Alcantara, Delfina Rincon and Mary Fernandez, had the same limited experience as the Plaintiffs, selling only Medicare products, exclusively in New York City, predominately to Spanish-speaking clientele. (Alcantara depo. 20, 25, 64-65; **Appendix 7**, Deposition of Opt-In Delfina Rincon ("Rincon depo."), at 15, 67, 77, 80, 82; Fernandez depo.  23-24, 36, 53, 66, 68)  As with the two Plaintiffs, not one of the New York Opt-Ins is presently employed by CHMI.

## III.     BENEFIT CONSULTANTS ARE SALES ASSOCIATES

Plaintiffs' Motion refers to the employees at issue as "Benefit Consultants," even though

that was not the job title of all of the Opt-Ins, let alone all the putative class members. Some of the Opt-Ins admitted that they were employed as "Sales Representatives." (Rincon depo. 45-48) See, e.g., **Appendix 8**, offer letter confirming the hiring of Opt-In Leisha Doherty as a "Medicare Sales Representative" in Syracuse, New York. See also **Appendix 9**, Opt-In Delfina Rincon's resignation letter: "I just wan[t] to let you know that I'll be resigning as a Medicare Sales Representative effective November 28.... Working here it has only made me a better sales person...." See also **Appendix 10**, Plaintiff Aponte's employment application for a "Sales Representative" position. See also **Appendix 11**, Opt-In Delfina Rincon's performance evaluation as a "Sales Rep": "I'm a very good sales person." See also **Appendix 12**, Declarant Winslow Johnson's offer letter: "You will be joining the Company as Medicare Sales Representative Syracuse, NY...."

Although their clients admitted that they were employed as "Sales Representatives" and that their primary duty was to make "sales," Plaintiffs' counsel resists using those terms and acknowledging those facts. Even Plaintiffs, who resisted the title Sales Representative, admitted that the employees whom they are seeking to represent all worked in either a Medicare Sales Department or a Medicaid Sales Department. (Aponte depo. 48-49; Correa depo. 76; see also Alcantara depo. 25; Rincon depo. 46) They were assigned to teams, referred to as "sales teams." (Aponte depo. 48) They reported to a Sales Manager, who reported to a Director of Sales, who in turn reported to the Vice President of Sales and Marketing. (Aponte depo. 53; Correa depo. 79-81. See also **Appendix 13**, Deposition of Opt-In Leisha Doherty ("Doherty depo."), at 8, 11-12; Fernandez depo. 59)

In fact, the 2010 Medicare Marketing Guidelines promulgated by the Federal Centers for Medicare and Medicaid Services ("CMS"), and cited in Plaintiffs' Motion, uses the term "sales person" to refer to individuals who market and/or sell such health plans:

> The term 'sales person' is used in these Medicare Marketing Guidelines
> to define an individual who markets and/or sells products for a single
> plan sponsor or numerous plan sponsors. It includes employees, brokers,

> agents, and all other individuals, entities, and downstream contractors
> that may be utilized to market and/or sell on behalf of a plan sponsor.

See Exhibit C1 to Plaintiffs' Motion, at 23 (emphasis added). The fact is that at different times and in different locations, the employees responsible for making sales for CHMI were referred to by different titles, including "Sales Representative," and "Benefit Consultant." (Beck depo. 83-84; **Appendix 14**, Deposition of Mary Solomon ("Solomon depo."), at 10; **Appendix 15,** Deposition of Yahely Merced ("Merced depo."), at 6-7) However, regardless of the time or location, CHMI has consistently identified and referred to these employees as "Sales Associates." (Beck depo. 8, 10-11, 83-84) Accordingly, throughout Defendant's Opposition the employees at issue will be referred to as "Sales Associates."

## IV.   WHILE SALES ASSOCIATES' PRIMARY DUTY IS SELLING WELLCARE HEALTH PLANS, THE MANNER IN WHICH THEY DO SO VARIES SIGNIFICANTLY

Regardless of how they prefer to refer to themselves, the Plaintiffs as well as the Opt-Ins have acknowledged in their depositions that their primary duty was to make sales by enrolling eligible prospects into WellCare Medicare or Medicaid health plans offered by CHMI.  (Aponte depo. 30-31; Correa depo. 21-25, 35-38; Alcantara depo. 27-28[4]; Rincon depo. 47-48, 53-57, 74; M. Fernandez depo. 23-24, 56, 65)  However, as detailed later in this Opposition, their deposition testimony also highlights that the way in which they performed their job duties and responsibilities varied significantly depending on the product they sold, the geography in which they sold it, the time period, and/or their supervisor.

Specifically, as the Plaintiffs described their job, they approached prospects, in some cases walking up to pedestrians on the streets, asked the prospects if they were eligible for Medicare or Medicaid, and if so, they then explained the advantages of the WellCare health plan products, with the goal of getting the prospect to sign an enrollment form and enroll in a WellCare health plan. (Aponte depo. 31-37, 41-45; Correa depo. 37-38; see also Alcantara depo. 29-35, 43-44, 53; Rincon depo. 56-58,

---

[4] Alcantara depo. 28:

   Q:   Was your primary duty or primary responsibility at WellCare to make those sales and get those enrollments?
   A:   Yes.

68-72; Fernandez depo. 38-39, 43-48) Enrolling a prospect into a WellCare health plan was referred to as a "sale," and the process of getting the prospect to sign the enrollment application form was referred to as "closing the sale." (Aponte depo. 57; Correa depo. 19, 32; Alcantara depo. 25-26; Rincon depo. 62-63; Fernandez depo. 76; Doherty depo. 80; Beck depo. 86-87) See also **Appendix 16**, Opt-In Francisca Alcantara's performance evaluation as "Sales Representative": "I go over the extra mile to work every weekend to increase my sales."

As described by the Plaintiffs and several Opt-Ins who sold the same products in New York City, they had sales quotas or sales targets that they were expected to meet, and the primary measure of their job performance was the number of enrollments or "sales" that they made. (Aponte depo. 54-55, 86; Correa depo. 21-23, 81; Alcantara depo. 50, 58; Rincon depo. 48, 50-51, 71; M. Fernandez depo. 58) Their compensation also was based on the number of enrollments or "sales" that they made. The Medicare Sales Associates in New York City were paid a base salary plus commissions based on the number of sales. (Aponte depo. 50-52; Correa depo. 21-22, 73; Alcantara depo. 26-27, 60; M. Fernandez depo. 67-68) A copy of the Compensation Plan that applied to Plaintiffs Miguel Aponte and Amado Correa is attached as **Appendix 17**. (Aponte depo. 50-51) The Compensation Plan is replete with references to "sales," and the Plaintiffs confirmed that enrolling someone in a WellCare health plan constituted a "sale." (Aponte depo. 50-52; Correa depo. 77-79)

The Plaintiffs' base salaries alone were approximately $42,000 per year, although base salaries varied based on what products a Sales Associate sold and where and when he was employed. (Correa depo. 73; Beck depo. 14-15) <u>**Including commissions, a number of putative class members, including several of the Opt-Ins, earned more than $100,000 per year.**</u> (See Alcantara depo. 61-62; Rincon depo. 65-66; Fernandez depo. 27-28) In addition to Opt-Ins Francisca Alcantara, Delfina Rincon and Mary Fernandez, Opt-In Maxine Davis made **$142,364** in 2008, and Opt-In Magdeline Rivas, made

$112,326 in 2007.  In fact, some CHMI Sales Associates in New York (as well as Florida and Illinois) made more than $200,000 in some years.

## ARGUMENT

**I.**  **PLAINTIFFS' NEW YORK LABOR LAW CLAIMS SHOULD NOT BE CERTIFIED AS CLASS CLAIMS BECAUSE PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF FED. R. CIV. P. 23**

Courts within the Second Circuit have recognized that "[t]he party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." See Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010) (internal citations omitted).  Pursuant to Rule 23, a proposed class action must "(1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." Id. at 547 citing Fed. R. Civ. P. 23(a). Moreover, Rule 23(b)(3) mandates the party seeking certification to show that "'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." Id. citing Fed. R. Civ. P. 23(b)(3).  This "predominance" requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Id. citing Amechme Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). In essence, the requirement is designed to "ensure[] that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural  fairness or bringing about other undesirable results.'" Id. citing Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 104 (2d Cir. 2007) (alteration omitted) (quoting Amchem, 521 U.S. at 615). Accordingly, the predominance requirement will be met "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more

9

substantial than the issues subject only to individualized proof." Id. (citing Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002)).

Under these settled standards, Plaintiffs' motion should be denied because Plaintiffs have made no showing to satisfy the evidentiary requirements of Rule 23, as required under recent Second Circuit case law.   Specifically, Plaintiffs cannot establish the requirements of Rule 23(a) since they cannot adequately represent the interests of the putative class and cannot demonstrate commonality or typicality. Further, Plaintiffs cannot satisfy the more rigorous predominance requirements of Rule 23(b).

A.     **Plaintiffs Cannot Satisfy The Commonality Requirement Of Rule 23(a)**

To satisfy the Rule 23(a)(2) requirement of commonality, a named plaintiff must demonstrate that common questions of law and fact are at the core of the class causes of action alleged. See Fed. R. Civ. P. 23(a)(2).  Although commonality "does not mean that all issues must be identical as to each member . . . it does require that plaintiff identify some unifying thread among the members' claims that warrants class treatment." Karvaly v. eBay, Inc., 245 F.R.D. 71, 81 (E.D.N.Y. 2007).  It is well-settled that claims which require "highly individualistic determinations" run afoul of the commonality requirement of Rule 23(a)(2). Pecere v. Empire Blue Cross and Blue Shield, 194 F.R.D. 66, 71 (E.D.N.Y. 2000). See also Diaz v. Electronics Boutique of America, 04-CV-0840E, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) (denying class certification for plaintiffs' New York Labor Law overtime claims, noting that "the question of whether defendant improperly classified employees as exempt is unique to each employee and his or her particular job responsibilities" and claims so "individual in nature" do not meet the commonality requirement of [Rule 23(a)] (internal citations omitted); Eng-Hatcher v. Sprint Nextel Corp., 07 Civ. 7350 (BSJ), 2009 U.S. Dist. LEXIS 127262, at **20-21 (S.D.N.Y. Nov. 13, 2009) (denying class certification based on plaintiff's failure to "offer sufficient evidence that her theory of a de facto policy existed at other stores in New York

[besides the one she worked at]," and thus failed to show that "each class member's claim arises from the same course of events"); <u>Edwards v. Publishers Circulation Fulfillment</u>, 268 F.R.D. 181, 184 (S.D.N.Y. 2010) (denying class certification for allegedly misclassified independent contractors' New York Labor Law claims, noting that "while forms of agreement and other standardized documents surely are pertinent to the analysis, they are not necessarily dispositive of what, ultimately, would be an individualized determination of the degree of control that [defendant] actually exercised over each of the putative class members"). In this case, Plaintiffs cannot satisfy the commonality element of Rule 23 as the differences in their job duties and responsibilities will require the Court to make individualized factual determinations as to whether they were properly classified as exempt.

> **1.    The Cookie-Cutter And Unsupported Declarations Offered By Plaintiffs' Motion Do Not Establish Common Circumstances Warranting a Class Action And Are Directly Contradicted By The Deposition Testimony Of The Plaintiffs And Opt-Ins**

Plaintiffs' Motion relies largely on Declarations from the Plaintiffs and Opt-Ins. Those Declarations make completely unsupported and conclusory allegations that the "duties and pay" of the Declarants "were common to all of Defendant's Benefit Consultant employees throughout New York." <u>See</u> Plaintiffs' Motion, p. 5. Not only are those Declarations unsupported, they are directly contrary to the sworn deposition testimony of the Plaintiffs and Opt-Ins. The Plaintiffs and Opt-Ins who worked in New York City confirmed that their experience and knowledge was limited to Medicare in New York City and that they did not know about the job of Sales Associates who worked in other places or sold other products. (Aponte depo. 71-72; Correa depo. 87) For example, Plaintiff Aponte testified that he was assigned to work exclusively in New York City, that he never went to any office outside New York City, and he does not know anything about the job duties of Medicare Sales Associates in other states, in Upstate New York, or even other parts of New York City. (Aponte depo. 67- 70[5]) Aponte also testified

---

[5] Aponte depo. 70:

>    Q: All you know about is how you and the other reps in the Bronx went about doing your job: correct?

11

that he only met a Medicaid Sales Associate on two occasions, and that he knows nothing about a Medicaid Sales Associate's job other than that there are different rules and regulations that apply to their jobs. (Aponte depo. 71-72[6])  Plaintiff Correa and the Opt-Ins similarly testified that their knowledge is limited to their narrow geographic territory, and that they do not know anything about the jobs of Medicare Associates who worked in other states or other parts of New York or Sales Associates who sold other products, even in the same areas where they worked.  (Correa depo. 87, 90[7]; Alcantara depo. 63-67[8]; Doherty depo. 74-75, 94; Fernandez depo. 66, 68)

### 2.      Different Sales Associates Performed Different Job Duties

It is undisputed that different Sales Associates had different responsibilities for generating and following up on sales leads.  (Beck depo. 31-32)  The Plaintiffs, who worked in New York City, confirmed that an important part of their job was to generate sales leads, and to then follow up on those leads by meeting with the prospects and trying to enroll them in a Medicare health plan. (Aponte depo. 31-32; Correa depo. 24-26 see also Alcantara depo. 28-29; Rincon depo. 54-55, 73)

The Plaintiffs testified that they also generated their own leads, by asking the prospects with whom they met for the names of family members and friends who might be interested in enrolling in the WellCare health plan. (Aponte depo.31-32; Correa depo. 25-26)   Opt-In Leisha Doherty, however, confirmed that was not part of the job for Medicare Sales Associates assigned to the Syracuse

---

A: Bronx, Manhattan, Brooklyn, yes.
[6] Aponte depo. 72:
      Q: So you can't tell me about Medicaid?
      A: No.
[7] Correa depo. 87:
      Q: Do you know anything about the Medicare reps in locations other than New York City?
      A: No.
Correa depo. 90:
      Q: Do you know anything about that, the Medicaid reps?
      A: No.
[8] Alcantara depo. 65:
      Q: Do you know anything about the jobs of people outside New York City?
      A: No

12

office. She did not ask prospects with whom she met whether they had family or friends who might be interested in a WellCare plan. (Doherty depo. 72. See also Beck depo. 31-32) Also, contrary to the experience of the Plaintiffs, Doherty testified that many of the appointments that she had with prospects were set up for her by her supervisor or office personnel. (Doherty depo. 55) The same applied to other Upstate New York Sales Associates. (See **Appendix 18**, Stephen Lester Declaration ("Lester Decl."), at ¶ 10: "Earlier on in my employment with the Company, many of the appointments I had with prospects were set up by my supervisor or resulted from leads given to me by other CHMI personnel.")

Differences in the job duties of various Sales Associates also is demonstrated by comparing the job descriptions attached to Plaintiffs' Motion to the Plaintiffs' and Opt-Ins' own deposition testimony about what job duties they did and did not perform. Plaintiffs' Motion argues that all of the putative class members perform the same job duties reflected in the job description, but the deposition testimony confirms that they performed different job duties. For example, the job description lists telemarketing, creating flyers and packets, public speaking, conducting new member orientations and event planning as part of the job, but the Plaintiffs and/or some of the Opt-Ins did not perform some or all of these tasks. (Aponte depo. 108-09; Correa depo. 82-83; Rincon depo. 74, 76, 77; Doherty depo. 69. Alcantara depo. 63-64; see also, Beck depo. 31-32, 36, 39-43, 50-51, 84-85)

The depositions of the Plaintiffs and Opt-Ins highlight a number of other differences and inconsistencies in their descriptions of their respective job duties and responsibilities, demonstrating the need for a specific, individual-by-individual analysis to determine what that individual's job actually involved and whether the individual satisfies one or more of the overtime exemption tests. For example, Opt-In Francisca Alcantara testified that as part of her job she was expected to and did recommend new sales sites and develop new sales sites. (Alcantara depo. 54-55) The same was true for Opt-Ins Brenda Gonzalez and Maria Nolasco. *See* **Appendix 19,** 2008 Self-Evaluation by Opt-In Brenda Gonzalez: "Site Development: I consistently develop sites in my territory every month. I am currently the RV 5

13    .

captain, which means that I have to look for RV locations and help develop those sites." See also **Appendix 20,** 2008 Self-Evaluation by Opt-In Maria Nolasco: "Site Development: [M]y team in RV 16 produces more sales than any other RV team in New York!"

Recommending and developing new sales sites requires the exercise of significant initiative, discretion, and independent judgment, all of which is relevant in evaluating whether an employee qualifies for the administrative employee exemption. See 12 NYCRR 142-2.14(c)(4)(ii)(b). In the exercise of her discretion and independent judgment, Alcantara recommended parking an RV outside a particular church on Sundays to take advantage of the pedestrian traffic coming to and from the church. (Alcantara depo. 53-56) The Plaintiffs, however, denied that part of their job was to recommend and develop new sales sites. (Aponte depo. 60; Correa depo. 31)

Apropos the outside sales exemption, on an individual-by-individual basis, there will be issues concerning how much time the individual employee spent performing non-sales work. See 12 NYCRR 142-2.14(c)(5). Although CHMI has a completely separate Customer Service Department with a dedicated Customer Service staff to assist existing members in their health plans, some of the Opt-Ins argue that they performed customer service work and other work that they claim did not involve making sales. (Alcantara depo. 16) This is yet another aspect in which the Plaintiffs are not similarly situated to or representative of, all other Sales Associates, and in which the nature and amount of the worked performed varied from individual to individual. (Fernandez depo. 37, 78;[9] see also Beck depo. 35-36)

Further, some Sales Associates engaged in telemarketing, but others did not. The Plaintiffs testified that they did not participate in telemarketing campaigns. (Aponte depo. 109; Correa

---

[9] Fernandez depo. 78:

    Q: Other than making sales and enrolling people in the plan, did you do any other type of work at WellCare?
    A: No, everything, my job was everything that has to do with promoting the company.
    Q: When you say the company, you mean the Medicare sales product?
    A: The Medicare...
    Q: Excuse me, the Medicare product?
    A: Yes.

depo. 83)  In contrast, Upstate New York Opt-In Leisha Doherty testified that she regularly was given a list of sales leads by the office and that on a daily basis she telephoned people on the list to see if they were interested in a WellCare health plan. (Doherty depo. 24-26)  Other Opt-Ins testified that was not part of their job and that they did not engage in telemarketing.  (Fernandez depo. 67)  In some markets, Sales Associates were specifically prohibited from engaging in telemarketing.  (Beck depo. 53)  That also was something that changed over time.  (Beck depo. 46-47; see also Solomon depo. 50-52)

### 3.     Sales Associates Spent Different Amounts Of Time In A CHMI Office

An important factor to consider under the outside sales exemption is the amount of time an employee spends in his employer's office.  See 12 NYCRR 142-2.14(c)(5).  The testimony of the Plaintiffs and Opt-Ins reflect substantial differences in the amount of time that Sales Associates spend in CHMI offices.  Plaintiffs, who worked in New York City, confirmed that they did not work in an office or any CHMI facility.  (Aponte depo. 67; Correa depo. 26, 57-58) Instead, they met and enrolled prospects in various locations outside the office, including on the street, at the homes of prospects, outside churches, outside banks, at pharmacies, at doctors' offices, at community centers, and at parades, fairs and other community events. After their initial training, they rarely even entered a CHMI office, only a few times a year.  (Aponte depo. 31, 39-42, 74; Correa depo. 24-26, 46-56)  With respect to that important issue, the job of the Plaintiffs was different from that of some of the Opt-Ins and putative class members.  For example, Opt-In Leisha Doherty testified that the job was different in the Syracuse, New York office, as opposed to in New York City.  Doherty testified that she and the other Medicare Sales Associates assigned to the Syracuse office went to that office every day, beginning each day in the CHMI office and often spending a good part of the day working in the office, meeting with prospects, telephoning prospects, and completing paperwork.  (Doherty depo. 45-46, 48-49)

### 4.     Different Sales Associates Worked At Different Types Of Locations

Plaintiff Amado Correa testified that he worked outside an RV every day.  (Correa depo.

15

69, 105)  Some of the other Medicare Sales Associates in New York City also worked out of RVs, which sometimes moved to several different locations during the course of a single day, with the goal of finding locations with the most pedestrian traffic. (Alcantara depo. 69-70; Aponte depo. 65-66; Fernandez depo. 43-45)  In contrast to the Plaintiffs, Opt-In Leisha Doherty, who worked Upstate as a Medicare Sales Representative in Syracuse, testified that only approximately 1% of the sales/enrollments that she made were from people she encountered on the street outside an RV. (Doherty depo. 66-67)  Many Sales Associates, in particular Sales Associates in Upstate New York, never or rarely worked out of an RV.  (See Lester Decl. ¶ 13.  See also Beck depo. 45-46: "Part of it is based on geography.  When I think about the way we sell in Downstate NY it is totally different than the way we sell in Upstate New York just due to the concentration of eligibles there.")[10]

### 5.   Some Sales Associates Engaged In Street Sales While Others Did Not, And This Changed Over Time And Varied By Location

Plaintiffs described the type of "street sales" that they engaged in, that was typical in New York City's Hispanic neighborhoods during certain periods of time but was not engaged in by other Sales Associates who worked at locations outside New York City.  Plaintiffs testified that they regularly worked at locations where there was a high volume of pedestrian traffic, and they approached pedestrians on the street and solicited them to enroll in a WellCare Medicare health plan.  If the individuals they approached were interested, they gave them a full-blown sales presentation and completed the sale on the spot, by filling out the enrollment form and having the individual sign the enrollment form on the spot. (Aponte depo. 31-37, 42-43; Correa depo. 35-38, 46-48)

Plaintiffs also admit that even within their own limited sales territory, things changed over time, mostly as a result in changes in the laws governing the sale of Medicare products.  Prior to October 2008, CHMI's New York City Sales Associates regularly approached pedestrians on the street

---

[10]   See also Beck depo: 71-72: "Some BCs would do RV storefront presentations, right; some would not.  Some would do formal sales events; some would not."

and solicited them to enroll in the WellCare health plan. (Aponte depo. 31-37, 42-43; Correa depo. 35-38, 46-48; Alcantara depo. 41; Rincon depo. 11-12, 68-71) However, after October 2008, the Sales Associates had to rely on give-aways to attract pedestrians to the tables they set up on the sidewalks because they had to wait for a pedestrian to approach them before soliciting the pedestrian to enroll in the WellCare health plan. (Aponte depo. 43, 45; Correa depo. 35-36, 40-41, 100) According to Amado Correa, "It was a big change" in the way he went about performing his job after October 2008. (Correa depo. 42-44; see also Beck depo. 46: "Over time, given changes in CMS regulations and the implementation of MIPPA, that's caused changes in the way we sell ….")

6.      **The Nature And Levels Of Supervision Varied Among Sales Associates**

In assessing whether an employee qualifies for the administrative exemption from the overtime pay requirements, the extent to which the employee works independently, with limited supervision, is one of the factors considered. See 12 NYCRR 142-2.14(c)(4)(ii)(b). The Plaintiffs' and Opt-Ins' deposition testimony demonstrates that was yet another area in which there were substantial differences among the Sales Associates. The deponents who worked in New York City confirmed that they worked without direct supervision; made their presentations to prospects and had prospects sign the enrollment forms in one-on-one meetings with the prospect; and were not accompanied by a supervisor. (Aponte depo. 36-37, 42, 44; Correa depo. 61-62; see also Alcantara depo. 50[11])   Upstate New York Opt-In Leisha Doherty, however, described a significantly different level of supervision.  According to Doherty, she and other Sales Associates who worked in Onondaga County, New York were often accompanied by a supervisor on appointments with prospects, and they met face-to-face with their supervisor on a daily basis.  (Doherty depo. 45-46, 53-54; See also Lester Decl. ¶ 15)

---

[11]  Alcantara depo. 50:
Q. So when you were making your sales presentations, you did that one-on-one with your customer?
A. One-on-one with my customer.

17

7.    **Compensation Policies And Structures Differed Based On The Nature Of The Product Sold As Well As When And Where The Sales Associate Worked**

Plaintiffs testified that they were paid according to a prototypical salesperson compensation plan, with a base salary plus commissions based on the number of sales that they individually made. (Aponte depo. 50-52; Correa depo. 21-22, 73)  A copy of the Compensation Plan that applied to them is attached as **Appendix 17.** The Compensation Plan is replete with references to "sales," and Plaintiffs Aponte and Correa confirmed that enrolling someone in the WellCare health plan constituted a "sale." (Aponte depo. 50-52; Correa depo. 77-79)  Base salaries alone were generally $42,000 per year. (Correa depo. 73) Including commissions, a number of putative class members, including several of the Opt-Ins, earned significant commissions, and some earned more than $100,000 per year in total compensation.  (Alcantara depo. 61-62; Rincon depo. 65-66; Fernandez depo. 27-28) However, the Compensation Plan that applied to Plaintiffs did not apply to some Opt-Ins and the majority of putative class members.  The way in which Sales Associates were compensated varied depending on what products they sold, where they worked, and when they were employed.

Some of the Opt-Ins who worked as Medicare Sales Associates testified that, in addition to a base salary, they also were paid commissions based on the number of sales they made. (Alcantara depo. 61-62; Rincon depo. 65-66; Fernandez depo. 27-28)  However, at least some Sales Associates who sold Medicaid products were not paid commissions. (Beck depo. 25)  Medicaid Sales Associates also generally were paid substantially lower base salaries than Medicare Sales Associates. (Beck depo. 77)  Unlike New York Medicare Sales Associates, New York Medicaid Sales Associates are not paid variable compensation based on the number of sales they make. They are eligible for a bonus, but sales production is only one of several factors that must be considered, and compensation cannot be tied directly to the number of sales. (Beck depo. 21-22, 25)

18

Another example of differences in compensation even among employees who sold the same products is that the compensation plan for Medicare Sales Associates in Upstate New York is different from the compensation plan for Medicare Sales Associates in New York City. (Doherty depo. 76-77; Beck depo. 18) Compensation policies varied not only based on the nature of the product sold and where the Sales Associate worked, but also based on when he or she was employed. Compensation plans changed at least annually, so a Sales Associate employed in 2007 was paid differently than a Sales Associate employed in 2010, even if they sold the same product in the same market. (Beck depo. 18, 27)

8.    **Different Sales Associates Received Different Sales Training**

Plaintiffs' Motion attaches as Exhibit M excerpts from "WellCare Sales Compliance Immersion Training" dated September 1, 2009, and argues that somehow supports [class] certification by demonstrating that certain practices were standard throughout the Company. That document in no way supports Plaintiffs' argument. First, the document and the practices addressed relate exclusively to Medicare Sales; they have no application to Medicaid Sales Associates. (Beck depo. 57-58, 80-82) Second, the "Model Office" practices addressed in the document did not go into effect until January 2010, long after the Plaintiffs' employment with WellCare ended. (Beck depo. 61, 63-64, 67-68) Third, the practices addressed in the document relate primarily to how Medicare Sales Managers were expected to manage their operations, and not the types of issues that impact the primary duties of a Medicare Sales Associate and their eligibility for overtime pay. (Beck depo. 53-54, 57-59)

In reality, different Sales Associates received different training, depending on what products they sold, where they worked, and when they were employed. (Merced depo. 4, 7-9, 15-16; Solomon depo. 46; **Appendix 21**, Deposition of Eugene Tuff ("Tuff depo."), at 9, 19-22) According to the Plaintiffs, training also varied among Sales Associates who sold the same products, and worked in the same market at the same time. Plaintiff Aponte and some of the Opt-Ins confirmed that they

received significant Medicare Sales Training from CHMI. (Aponte depo. 111; Rincon depo. 62)  Some acknowledge receiving training that included mock sales presentations and instruction on various sales techniques and how to "close" a sale. (Rincon depo. 62-65; see also Medicare sales training memorandum, attached as **Appendix 22**)  However, this is another area in which the deposition testimony differed, because Plaintiff Correa and at least one Opt-In testified that they did not receive sales training at CHMI.  (Correa depo. 84, 92-93; Alcantara depo. 51)

   9. **Sales Associates Had Different Selling Periods**

   The time periods during which Sales Associates could engage in certain sales activities and enroll new members in a health plan also varied depending on where the Sales Associate was employed and what products he/she was authorized to sell.  That also varied over time, based on changes in government regulations and Company policies. (See **Appendix 24**, Robert Freeman Declaration ("Freeman Decl."), at ¶ 17)  For example, there is a limited Annual Enrollment period applicable to Medicare plans, but individuals generally can be enrolled in Medicaid plans throughout the year. (Frazer depo. 26)  Further, the geographic area within which different Sales Associates can engage in sales activities also varies.  For example, a New York Medicare Sales Associate is limited to selling in a single county.  (Doherty Depo. 9-10)  A New York Medicaid Sales Associate, on the other hand, is not limited to selling in a particular county.  (Frazer depo. 28-29)

   For all of the foregoing reasons, which require the Court to examine each of the putative class members job duties and responsibilities in order to determine whether or not they were properly classified as exempt over a six year time period, Plaintiffs have not met their burden of satisfying the commonality requirement of Rule 23.

   10. **Different Legal Issues Apply To Different Individuals**

    (a) <u>Outside Sales Versus Administrative Exemption</u>

   A different overtime exemption will be at issue with respect to some individuals.  While

Defendant is confident that all of its Sales Associates are exempt outside sales employees, for individuals who argue that their job involved marketing and promotion rather than sales, there will be additional and different legal issues that will need to be decided.  In particular, for those who argue that they did not make sales, there will be separate legal issues relating to whether they qualify for the administrative employee exemptions.  The administrative employee exemption is significantly different from the outside sales exemption and raises a host of different legal and factual issues.  Compare 12 NYCRR 142-2.14(c)(4)(ii) and 12 NYCRR 142-2.14(c)(5).

> (b) Certain Sales Associates Released Their Claims In Exchange for Severance

Some former New York Sales Associates signed releases, waiving, among other things, their claims under the NYLL. At various times, CHMI has had reductions in force that resulted in the termination of a significant number of Sales Associates. In connection with those reductions in force, and also under other circumstances, many former Sales Associates signed agreements that waived and released a variety of employment-related claims. Accordingly, for those former Sales Associates who signed such releases, such as Opt-In Ruben Mercedes, there will be additional and different factual and legal issues relating to their waiver of claims for overtime pay under the New York Labor Law. (See **Appendix 23,** Separation Agreement and General Release for Opt-In Ruben Mercedes).  See also DiFilippo et al., v. Barclays Capital, Inc., 552 F. Supp. 2d 417, 426-27  (S.D.N.Y. 2008) (employees may validly waive their overtime rights under the New York Labor Law) (citing Simel v. J.P. Morgan Chase, No. 05 Civ. 9750, 2007 U.S. Dist. LEXIS 18693, at *2 (S.D.N.Y. Mar. 19, 2007)).

**B.** **Plaintiffs Cannot Satisfy The Typicality Requirement Of Rule 23(a)**

In order to grant certification of a class action under Rule 23, the Court also must find that "the claims and defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Where commonality looks to the relationship between the class members, typicality seeks to ensure that the class representatives' claims are sufficiently similar to the

claims of the purported class. <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 159 (1982). A named plaintiff's claims are "typical" under Rule 23(a)(3) only where each class members' claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. See <u>Dunnigan v. Metropolitan Life Ins. Co.</u>, 214 F.R.D. 125, 137 (S.D.N.Y. 2003). While the mere existence of individualized factual questions with respect to the class representative's claim will not preclude a finding of typicality, class certification is inappropriate on typicality grounds where a "putative class representative is subject to unique defenses which threaten to become the focus of the litigation." <u>Id.</u> Further, the court in <u>Diaz</u>, discussed <u>supra</u>, noted that a purported class of store managers and assistant store managers were neither typical of each other or of those in the proposed class. The court explained that "the individualized nature of claims alleging incorrect exemption status preclude meeting the typicality requirement" and "[w]here [unique] defenses...threaten[] to become the focus of the litigation, the plaintiff cannot be considered 'typical' of the class" (internal citations omitted).

Again, Plaintiffs have presented no competent evidence to the Court – documentary, anecdotal, or otherwise – that their claims are typical of other putative class members. In addition to the reasons explained in Defendant's commonality argument <u>supra</u>, Plaintiffs have limited knowledge regarding New York City Medicare Sales Associates after June 1, 2009, even less knowledge regarding Upstate New York Medicare Sales Associates, and no knowledge whatsoever of Medicaid Sales Associates. Further, since Aponte and Correa claim to have engaged in similar duties and responsibilities during a limited time period in a limited geography, their claims are not typical of other putative class members, such as those who engaged in different duties and activities such as telemarketing, event planning, new member orientations, and annual sales training. Accordingly, Plaintiffs have not met their burden of satisfying the typicality requirement of Rule 23.

**C.**     **Plaintiffs Cannot Satisfy The Adequacy Of Representation Requirement Of Rule 23(a)**

As noted _supra_, different legal issues apply to different putative class members (_e.g.,_ whether the outside sales or administrative exemption applies under New York law). Given that unique defenses exist to the claims asserted for Plaintiffs but not necessarily to all members of the putative class, Plaintiffs cannot satisfy Rule 23(a)(4)'s requirement that they be adequate class representatives. See Dauphin v. Chestnut Ridge Transp., Inc., 06 Civ. 2730 (SHS), 2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2009) (denying class certification because, _inter alia_, plaintiffs were found to be inadequate class representatives as the motor carrier exemption potentially could defeat their claims); Noble v. 93 Univ. Place Corp., 224 F.R.D. 330, 344 (S.D.N.Y. 2004) (holding that lead plaintiff was inadequate because he had a unique defense and possessed a claim against defendant other than the class claim).

Plaintiffs cannot properly represent the interests of Sales Associates who sold other types of WellCare products as Plaintiffs admittedly have no familiarity with the day-to-day job responsibilities of such Sales Associates, the compensation paid to such Sales Associates, or the regulations governing the sales of such products. (See Aponte depo. 72; Correa depo. 90) In addition, depending on the type of product sold, Sales Associates report to entirely different sets of managers in entirely separate departments, and have little if any interaction with one another. (See Aponte depo. 49, 53, 71-72, 78; Correa depo. 79-80, 90-91) Moreover, Plaintiffs are inadequate class representatives for the entire class of Medicare Sales Associates because they only engaged in Medicare Sales during a short period of time. (See Aponte and Correa Declarations, attached as Exhibits E and F to Plaintiff's Motion, at ¶ 4) They have no personal knowledge as to how Defendant's business changed in 2009 and thereafter, and are not familiar with how Medicare Sales Associates hired in and after mid-2009 went about performing their jobs. Furthermore, Plaintiffs are inadequate class representatives for Medicare Sales Associates, such as Opt-In Liesha Doherty, employed in Upstate New York. As demonstrated

23

supra, there are drastic differences between the two regions, and Plaintiffs have no personal knowledge with respect to how business is conducted upstate. (See Aponte depo. 70; Correa depo. 87)

**D.    Plaintiffs Cannot Satisfy The More Rigorous Requirements of Rule 23(b)**

Rule 23(b)(3) permits class certification only "if the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

**1.    Individual Questions Predominate Over Common Issues**

In order to meet the "predominance" requirement of Rule 23(b)(3), a plaintiff must establish that there are issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, and that those issues predominate over those issues that are subject only to individualized proof.  See Dunnigan, 214 F.R.D. at 137. The predominance requirement is "more stringent" and "far more demanding" than the commonality requirement of Rule 23(a)(2), see Dunnigan, supra, and is not met where the "resolution of individual claims for relief would require individual inquiries." Id. at 138.

Courts in this Circuit have become increasingly skeptical about certifying class actions pursuant to Rule 23(b)(3) involving wage-hour or other employment-related disputes. See, e.g., Myers, supra, 624 F.3d 537 at 551-52.  In Myers, the Second Circuit affirmed the District Court's denial of class certification on predominance grounds because to resolve the question as to whether plaintiffs were entitled to overtime under the FLSA or subject to an exemption was "a complex, disputed issue…requir[ing] the district court to decide a number of subsidiary questions involving whether plaintiffs fall within the Labor Department's criteria for the [executive exemption]". Id. at 548.  The Court in Myers also noted that a "blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry: the balance between individual and common issues.'"

Id. at 549. Rather, "[i]n possible contrast to a uniform corporate policy detailing employees' job duties, the fact of common exemption does not establish whether all plaintiffs were *actually* entitled to overtime pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions." Id. (emphasis in original).

    Other courts have reached similar conclusions. See Deboissiere v. American Modification Agency, 09-CV-2316 (JS)(MLO), 2010 U.S. Dist. LEXIS 113776, at **5-7 (E.D.N.Y. Oct. 22, 2010) (denying class certification for plaintiffs' New York Labor Law claim on, inter alia, predominance grounds because "there may be significant individual factual issues about whether any particular proposed class member qualifies under the 'outside salesperson' exemption pursuant to 12 NYCRR 142-2.14(c)(5)"). See also Hendricks v. Minzie, 263 F.R.D. 78, 89 (D. Conn. 2009) (class certification denied based on inter alia predominance grounds where potential class members held "a wide variety of positions and perform[ed] a wide variety of job duties" and that resolution of the factual questions that have been presented in this case cannot be achieved through generalized proof."); Kopera v. Home Depot, 09 Civ. 8337 (WHP), 2011 U.S. Dist. LEXIS 3382 (S.D.N.Y. Jan. 11, 2011) (denying class certification in NYLL case because the question as to whether the class members were properly classified as satisfying the executive exemption required a case-by-case inquiry).

    In the present case, it is abundantly clear that the Court will be forced to engage in an individualized assessment to determine the applicability of the outside sales exemption. As discussed above, the same questions of law and fact are not common to all Sales Associates. First, Sales Associates had different job functions depending on the products they sold as well as the different regulations governing the sales of those products. Second, Sales Associates had different responsibilities for generating and following up on sales leads, including utilizing doctor's offices, pharmacies, prospecting their own leads, or receiving leads from management. Third, Sales Associates spent significantly different amounts of time in CHMI's offices and working out of RVs. Fourth,

depending on the product they sold and where they worked, Sales Associates had different compensation policies and structures.   Fifth, some Sales Associates engaged in street sales, telemarketing and/or what they characterized as customer service-related activities, but others did not. Sixth, depending on the product they sold and their location, Sales Associates spent different amounts of time on non-sales activities.   Finally, different legal and factual issues will apply depending on whether the administrative exemption is applicable and whether putative class members executed separation agreements that, among other things, waived their claims under the NYLL.

### 2.    The Proposed Class Action Is Not Superior To Individual Actions

The superiority prong of the Court's analysis under Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication.   See Dunnigan, 214 F.R.D. at 142.   The factors relevant to the "superiority" of the class action include: (a) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (b) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (c) the difficulties likely to be encountered in the management of the class action.   See Id.   Significantly, a class action is not a "feasible, let alone superior method for the fair, efficient and manageable adjudication" of putative class members' claims if a court would be "required to conduct a series of mini-trials" as to each claim.   Dunnigan, supra; see Potchin v. Prudential Home Mortg. Co., No. 97-CV-525 (CBA), 1999 U.S. Dist. LEXIS 22480, at *28-30 (E.D.N.Y. Nov. 12, 1999) (denying certification of a proposed class where a "detailed examination of the facts of each transaction" at issue could not be avoided); Pecere, 194 F.R.D. at 72 (denying class certification and noting that where individual issues of fact predominate over common issues of fact, a class action is not a "superior method for fair and efficient adjudication").   As discussed above, in the present case, an individualized assessment of each potential class member's claims will be necessary and will force the Court to conduct separate mini-

trials to determine the viability of each claim. Accordingly, Plaintiffs have not met their burden of satisfying the superiority requirement of Rule 23.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.

Respectfully submitted,

/s/ Peter C. Moskowitz
Peter C. Moskowitz, Esq.
Jason A. Zoldessy, Esq.
JACKSON LEWIS LLP
666 Third Avenue
New York, New York 10017
Telephone: (212) 545-4000
Facsimile: (212) 972-3213

Emmett F. McGee, Jr., Esq. (admitted *pro hac vice*)
Paul A. Mallos, Esq. (admitted *pro hac vice*)
JACKSON LEWIS LLP
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
Telephone: (410) 415-2000
Facsimile: (410) 415-2001

ATTORNEYS FOR DEFENDANT

Dated: February 10, 2011

27

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for Defendant Comprehensive Health Management, Inc, hereby certifies that on this 10th day of February, 2011, the foregoing document was filed electronically with the Clerk of the Court.   Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt including:   Andrew Frisch, Esq., Carlos Leach, Esq., Morgan & Morgan, 6824 Griffin Road, Davie, FL 33314, Counsel for Plaintiffs.


/s/ Jason A. Zoldessy
Jason A. Zoldessy
Attorney for Defendant

28