UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MIGUEL APONTE AND
AMADO CORREA, on behalf of themselves and
all similarly situated individuals,

        Plaintiffs,

    v.

COMPREHENSIVE HEALTH
MANAGEMENT, INC.,

        Defendant.

Case No.:  **10-cv-4825 (PKC)**

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF THIS CASE AS A "COLLECTIVE ACTION" AND NOTICE TO POTENTIAL OPT-INS

JACKSON LEWIS LLP

666 Third Avenue
New York, New York 10017
Telephone:  (212) 545-4000
Facsimile:  (212) 972-3213

2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland  21209
Telephone:  (410) 415-2000
Facsimile:  (410) 415-2001

Attorneys of Record:
Peter C. Moskowitz, Esq.
Jason A. Zoldessy, Esq.
Emmett F. McGee, Jr., Esq. (admitted *pro hac vice*)
Paul A. Mallos, Esq. (admitted *pro hac vice*)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii-iv

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 3

I.   CHMI'S BUSINESS ....................................................................................................... 3

    A.   CHMI's Segmented and Decentralized Organizational Structure ........................... 4

    B.   Medicare Sales And Medicaid Sales ....................................................................... 4

II.  THE PLAINTIFFS AND OPT-INS ............................................................................... 5

III. BENEFIT CONSULTANTS ARE SALES ASSOCIATES ............................................ 6

IV.  WHILE SALES ASSOCIATES' PRIMARY DUTY IS SELLING WELLCARE HEALTH
    PLANS, THE MANNER IN WHICH THEY DO SO VARIES SIGNIFICANTLY ...................... 7

LEGAL STANDARD ............................................................................................................ 9

ARGUMENT ......................................................................................................................... 10

I.   PLAINTIFFS' PROPOSED COLLECTIVE ACTION IS OVERBROAD AS PLAINTIFFS
    ARE NOT SIMILARLY SITUATED TO THE PUTATIVE CLASS MEMBERS ..................... 10

    A.   Different Sales Associates Performed Different Job Duties ................................... 11

    B.   Sales Associates Spent Different Amounts Of Time In A CHMI Office .............................. 14

    C.   Different Sales Associates Worked At Different Types Of Locations ................................. 15

    D.   Some Sales Associates Engaged In Street Sales, But Others Did Not, And This
        Changed Over Time ................................................................................................... 15

    E.   The Nature And Levels Of Supervision Varied Among Sales Associates ........................... 17

    F.   Different Compensation Policies And Structures Applied To Different Individuals .......... 17

    G.   The Existence And Nature Of Sales Targets Varied ................................................. 19

    H.   Different Legal Issues Apply To Different Individuals ............................................ 20

    I.   The Lin Lawsuit Does Not Support Plaintiffs' Motion For Conditional Certification ......... 21

    J.   Other Differences Between Sales Associates ........................................................... 22

    K.   The Foregoing Differences Would Require An Individualized Investigation ...................... 23

i

II.   PLAINTIFFS' CONCLUSORY AND UNSUPPORTED ALLEGATIONS ARE
      INSUFFICIENT WITH RESPECT TO EITHER PHASE OF THE COURT'S INQUIRY .........26

      A.   The Conclusory And Unsupported Declarations Offered By Plaintiffs' Motion Are
           Contradicted By The Deposition Testimony Of The Plaintiffs And Opt-Ins .......................26

      B.   Plaintiffs' Motion Misinterprets Selected Excerpts From CHMI's Medicare Sales
           Compliance Training Materials ...........................................................................................28

III.  DEFENDANT WILL SUCCEED IN SHOWING PLAINTIFFS ARE NOT ENTITLED TO
      OVERTIME COMPENSATION BECAUSE OF THE OUTSIDE SALES EXEMPTION .........29

IV.   IF THE COURT GRANTS CONDITIONAL CERTIFICATION, PLAINTIFFS'
      PROPOSED NOTICE IS DEFECTIVE ..........................................................................................30

      A.   The Notice Should Have A Two, Rather Than Three, Year Window ..................................30

      B.   The Group Identified To Receive The Opt-In Notice Is Overbroad ...................................31

      C.   The Notice Should Not Be Posted At Defendant's Locations .............................................32

      D.   Plaintiffs' Proposed Notice Should Be Rejected As Misleading And An Overt
           Solicitation ..........................................................................................................................32

CONCLUSION .........................................................................................................................................33

## TABLE OF AUTHORITIES

### FEDERAL CASES

Amendola v. Bristol-Myers Squibb Co.,
558 F. Supp. 2d 459 (S.D.N.Y. 2008) .................................................................................9, 29

Anglada v. Linen N Things, Inc.,
06 Civ. 12901 (CM)(LMS), 2007 U.S. Dist. LEXIS 39105 (S.D.N.Y. Apr. 26, 2007) ......................25

Ayers v. SGS Control Services, Inc.,
No. 03-civ-9078 (RMB (RLE), 2004 U.S. Dist. LEXIS 25646 (S.D.N.Y. Dec. 16, 2004) .................26

Belcher v. Shoeney's, Inc.,
927 F. Supp. 249 (M.D. Tenn. 1996) .................................................................................33

Belt v. Emcare, Inc.,
299 F. Supp. 2d 664 (E.D. Tenn. 2003) ............................................................................33

Clausman v. Nortel Networks,
02-0400-C-M/S (LJM), 2003 U.S. Dist. LEXIS 11501 (S.D. Ind. May 1, 2003) ..........................29, 30

Cuzco v. Orion Builders, Inc.,
477 F. Supp. 2d 628 (S.D.N.Y. 2007) ...............................................................................10

Davis v. Abercrombie & Fitch Co.,
08 Civ. 1859 (PKC), 2008 U.S. Dist. LEXIS 86577 (S.D.N.Y. Oct. 22, 2008) .............................24

Dean v. Priceline.Com, Inc.,
00 Civ. 1273 (DJS), 2001 U.S. Dist. LEXIS 24982 (D. Conn. Jun. 5, 2001) ...............................23

Diaz v. Electronics Boutique of America, Inc.,
No. 04 Civ. 0840E (SR), 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005) .........................10

DiFilippo et al., v. Barclays Capital, Inc.,
552 F. Supp. 2d 417 (S.D.N.Y. 2008) ...............................................................................21

Eng-Hatcher v. Sprint Nextel Corp.,
07 Civ. 7350 (BSJ), 2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009) .............................25

Evancho v. Sanofi-Aventis,
07-2266 (MLC), 2007 U.S. Dist. LEXIS 93215 (D.N.J. Dec. 19, 2007) .......................................30

Gordon, et al. v. Kaleida Health, et al.,
08-CV-378S (WMS), 2009 U.S. Dist. LEXIS 95729 (W.D.N.Y. Oct. 14, 2009) .............................32

Guillen v. Marshalls off MA, Inc.,
09 Civ. 9575 (LAP) (GWG), 2010 U.S. Dist. LEXIS 121419 (S.D.N.Y. Nov. 18, 2010) .................24

Hendricks v. J.P. Morgan Chase Bank,
263 F.R.D. 78 (D. Conn. 2009)..................................................................................... 9, 10

Hoffmann-La Roche, Inc. v. Sperling,
493 U.S. 165 (1989)..........................................................................................................9

Laroque v. Domino's Pizza,
557 F. Supp. 2d 346 (E.D.N.Y. 2008)...........................................................................31

Lynch v. United Servs. Auto Ass'n,
491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007) .....................................................................9

McLaughlin v. Richland Shoe Com,
486 U.S. 128 (1998)........................................................................................................30

Mendoza v. Casa De Cambio Delgado, Inc.,
No. 07 Civ. 2579 (HB), 2008 U.S. Dist. LEXIS 27519 (S.D.N.Y. Apr. 7, 2008) ...............25

Monger v. Cactus Salon & Spa's LLC,
08-CV-1817 (FB)(WDW), 2009 U.S. Dist. LEXIS 60066 (E.D.N.Y. July 6, 2009) ..........25

Morales v. Plantworks, Inc.,
05 Civ. 2349 (DC), 2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 2, 2006) ........................25

Olivo v. GMAC,
374 F. Supp. 2d 545 (E.D. Mich. 2004)........................................................................29

Realite v. Ark Restaurants Corp.,
7 F. Supp. 2d 303 (S.D.N.Y. 1998)..................................................................................9

Romero v. Flaum Appetizing Corp.,
07 Civ. 7222 (BSJ), 2009 U.S. Dist. LEXIS 80498 (S.D.N.Y. Aug. 17, 2009) .................32

Shajan v. Barolo LTD,
10 Civ. 1385 (CM), 2010 U.S. Dist. LEXIS 54581 (S.D.N.Y. Jun. 2, 2010)......................32

Updite v. Delta Beverage Group, Inc.,
No. 06-0593 (SMH), 2006 U.S. Dist. LEXIS 90719 (W.D. La, December 15, 2006) .........31

Vaicaitiene v. Partners in Care, Inc.,
No. 04 Civ. 9125 (RMB)(THK), 2005 U.S. Dist. LEXIS 13490 (S.D.N.Y. July 6, 2005) .........31

Walton v. United Consumers Club, Inc.,
786 F.2d 303 (7th Cir, 1986)..........................................................................................30

## PRELIMINARY STATEMENT

Plaintiffs Miguel Aponte and Amado Correa ("Plaintiffs") are former Sales Associates at Defendant Comprehensive Health Management, Inc. ("Defendant" or "CHMI"). Plaintiffs ask this Court to conditionally certify this case as a collective action under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), and to send notice to every employee who works or has worked for CHMI in all twelve states CHMI operates within the last three years selling WellCare health plans to Medicare and Medicaid eligible individuals, regardless of the positions they held or the duties they performed; the different products they sold; the different ways they sold the products; the different regulatory requirements that applied to the sale of those products; or how they were paid or the compensation plans that applied to them.

The Plaintiffs claim that Defendant misclassified them as exempt employees and did not pay them overtime for the hours in excess of 40 per week they claim they worked. This case is not appropriate for certification as a collective action because the determination of whether each member of the putative class was properly classified as exempt requires an individualized assessment of each individual's actual duties and the manner in which they were performed. To make this determination the Court will be required to assess whether each person was engaged in selling health plans, how they went about performing their jobs, how much time they spent each day selling health plans, whether they were selling the health plans from within or outside an office of Defendant, how they were compensated, and for some the level of discretion and independent judgment they exercised.

Defendant has taken an abbreviated deposition of the two Plaintiffs and four of the Opt-Ins and Defendant's Opposition is based largely on the deposition testimony of the Plaintiffs and the Opt-Ins themselves. As reflected in their deposition testimony, although the putative class members all had the primary duty of making sales and enrolling individuals in one of the insurance

plans offered by CHMI, their jobs otherwise differed in a variety of material respects relevant to the Court's inquiry as to whether they were properly classified as exempt including:

- <u>Different Job Functions</u> -- depending on the products they sold as well as different regulations governing the sales of the products;

- <u>Different Responsibilities for Generating and Following up on Sales Leads</u> -- including utilizing doctor's offices, pharmacies, prospecting their own leads, or receiving leads from supervisors;

- <u>Different Amounts of Time Spent in Defendant's offices</u> - some almost never came to the office, some worked at home, others worked out of roving recreational vehicles ("RVs");

- <u>Different Compensation Policies and Structures</u> – depending on the product they sold and where they worked;

- <u>Different Daily Tasks</u> – some engaged in street sales, telemarketing and/or what they characterized as customer service-related activities, but others did not;

- <u>Different Amounts of Time Spent on Non-Sales Activities</u> – depending on product and geography; and/or

- <u>Different Legal and Factual Issues</u> - depending on whether the administrative exemption is applicable, whether they earned over $100,000, and whether they signed releases.

Furthermore, the nature of the sales function and the way the products were sold, as well as the manner in which Sales Associates were compensated and how their job performance was measured, also varied over time. As a result, a Sales Associate employed in 2006, for example, was not similarly situated to a Sales Associate who was employed in 2010, even if they sold the same products and worked in the same market. The deposition testimony of the Plaintiffs and Opt-Ins also demonstrates that their job duties and how they went about performing their jobs also differed significantly from other Sales Associates who worked at the same time, selling the same products in the same markets. As Plaintiff Amado Correa testified, "different reps worked differently." (See **Appendix 1**, Deposition of Amado Correa ("Correa depo."), at 56)

2

Plaintiffs' Motion relies largely on cookie-cutter Declarations from the Plaintiffs and Opt-Ins.   Not only are those Declarations conclusory and unsupported in their assertions that the putative class members are similarly situated, but they are directly contrary to the sworn deposition testimony of the Plaintiffs and Opt-Ins.  Accordingly, Plaintiffs' Motion should be denied because Plaintiffs cannot demonstrate that CHMI's Sales Associates are sufficiently similarly situated to certify a collective action.

**STATEMENT OF FACTS**

The facts relevant to this Motion are summarized below and in Section I of the Argument, which details the differences between the putative class members that the Court will need to assess in order to determine whether each member was properly classified as exempt.

## I.   CHMI'S BUSINESS

CHMI is a third-party administrator and is indirectly owned by WellCare Health Plans, Inc. The WellCare group of companies ("WellCare") provides managed care services exclusively for government-sponsored health care programs focusing on Medicare and Medicaid. WellCare offers a variety of health plans for families, children, the aged, blind, and disabled. Although its markets have changed over time, through its licensed subsidiaries, WellCare currently operates Medicaid health plans in Florida, New York, Illinois, Indiana, Hawaii, Missouri, Ohio, and Georgia; and operates Medicare Advantage coordinated care plans in Florida, New York, Connecticut, Illinois, Indiana, Hawaii, Louisiana, Missouri, New Jersey, Ohio, Georgia, and Texas. (See **Appendix 2**, 2009 WellCare Annual Report, at 3; **Appendix 3**, deposition of Robert Beck ("Beck depo."), at 12)[1]  CHMI employs the sales force responsible for selling various WellCare health plans to Medicare- and Medicaid-eligible individuals.  (Beck depo. 8-9)  CHMI, however, does not employ Sales Associates in all of the states in which WellCare operates. (Beck depo. 22-23)

---

[1]    Robert Beck is WellCare's Vice President for Sales and Marketing Operations.  (Beck depo. 5-7)

WellCare also contracts with independent insurance agents to sell its Medicare health plans. (Beck depo. 71; see also **Appendix 4**, Andrea Pinder Declaration ("Pinder Decl."), at ¶ 1)

### A.    CHMI's Segmented and Decentralized Organizational Structure

CHMI is organized into different markets based on geography, and is further divided between Medicare and Medicaid sales. (Beck depo. 11-12) Some states, such as New York and Florida, include more than one market. (Beck depo. 12) For example, New York City and Upstate New York are two distinct markets. Each market is considered a separate business unit, with its own distinct budget, cost structure, profit and loss responsibility, and management structure. (Beck depo. 11) Within a particular market, the Sales Associates are organized into different "sales teams." The "sales teams" are supervised by a "Sales Manager," and the Sales Managers in turn report to the "Sales Director" for the market. (Beck depo. 58)

### B.    Medicare Sales And Medicaid Sales

The states and markets in which CHMI sells Medicaid products are not the same as the states and markets in which CHMI sells Medicare products. (Beck depo. 12) Although CHMI offers both Medicare and Medicaid products in New York, the Medicaid Sales organization in each market is separate from the Medicare Sales organization. (Beck depo. 51-52; see also **Appendix 5**, Deposition of Justin Frazer ("Frazer depo."), at 13, 20) Medicaid Sales Associates report to different Sales Managers and Sales Directors than Medicare Sales Associates. (Correa depo. 79-80, 90-91; see also **Appendix 6**, Deposition of Miguel Aponte ("Aponte depo."), at 49, 53, 71-72, 78) Medicaid Sales Associates are not authorized to sell Medicare products and enroll people in Medicare health plans, and Medicare Sales Associates are not authorized to sell Medicaid products and enroll people in Medicaid plans. (Correa depo. 87; see also Alcantara depo. 66-67; Fernandez depo. 24, 36, 68-69; Doherty depo. 93) Because Medicaid sales is regulated by state and local laws, the sales activities of Medicaid Sales Associates in New York City are subject to separate and additional regulatory

4

requirements that do not apply to Medicare Sales Associates in New York City or to Medicaid Sales Associates in Upstate New York.  (Frazer depo. 13-20; Beck depo. 48-52)

## II.     THE PLAINTIFFS AND OPT-INS

      Plaintiffs both worked as Sales Associates in New York City, selling exclusively Medicare insurance products, primarily to Spanish-speaking immigrants in predominately Hispanic neighborhoods. (Correa depo. 68-69, 86-87, 99-100; see also Aponte depo. 60, 67-68, 81)  Plaintiffs were employed for only relatively short periods of time, in comparison to the three-year period they seek to cover in this action.   Aponte was employed from May 12, 2008 to April 1, 2009; and Correa was employed from July 29, 2007 to June 1, 2009.  (See Aponte and Correa Declarations, attached as Exhibits C and D to Plaintiff's Motion, at ¶ 4)

      Twenty-one additional individuals have opted into the case:  Francisca Alcantara, Delfina Rincon, Leisha Doherty, Maria Fernandez, Luis Mercedes, Jose Velez, Victor Carrasco, Magdalene Rivas, Luisa de Jesus, Maxine Davis, Ginette Beltre, Patricia Siaca, Sandy Godfrey, Osmill Lambertus, Brenda Gonzalez, Maria Nolasco, Bolivar Rosario, Adrian Figueroa, Ruben Mercedes, Yahaira Ramirez, and Rosa Ramirez (the "Opt-Ins").  Nearly all of the Opt-Ins had the same limited experience as the Plaintiffs, selling only Medicare products, exclusively in New York City, predominately to Spanish-speaking clientele. (**Appendix 7,** Deposition of Francisca Alcantara ("Alcantara depo."), at 20, 25, 64-65; **Appendix 8,** Deposition of Delfina Rincon ("Rincon depo."), at 15, 67, 77, 80, 82; **Appendix 9,** Deposition of Maria Fernandez ("Fernandez depo."), at  23-24, 36, 53, 66, 68)  In fact, the only Opt-Ins who did not work in New York City are Leisha Doherty, who sold only Medicare products exclusively in Omondaga County, New York, and Sandy Godfrey who sold only Medicare products exclusively in CHMI's South Florida market.   Only one Opt-In, South Florida Sales Associate Sandy Godfrey, is still employed by CHMI, and she has been on inactive status since June 2010.

III.   <u>BENEFIT CONSULTANTS ARE SALES ASSOCIATES</u>

Plaintiffs' Motion refers to the employees at issue as "Benefit Consultants," even though that was not the job title of all of the Opt-Ins, let alone all the putative class members. Some of the Opt-Ins admitted that they were employed as "Sales Representatives." <u>See</u>, <u>e.g.</u>, **Appendix 10**, offer letter confirming the hiring of Opt-In Leisha Doherty as a "Medicare Sales Representative" in Syracuse, New York. <u>See also</u> **Appendix 11**, Opt-In Delfina Rincon's resignation letter: "I just wan[t] to let you know that I'll be resigning as a Medicare Sales Representative effective November 28…. Working here it has only made me a better sales person…." (Rincon depo. 45-48)   <u>See also</u> **Appendix 12**, Plaintiff Aponte's employment application for a "Sales Representative" position. <u>See also</u> **Appendix 13**, Opt-In Delfina Rincon's performance evaluation as a "Sales Rep": "I'm a very good sales person." <u>See also</u> **Appendix 14**, Declarant Winslow Johnson's offer letter: "You will be joining the Company as Medicare Sales Representative Syracuse, NY…."

Although their clients admitted that they were employed as "Sales Representatives" and that their primary duty was to make "sales," Plaintiffs' counsel resists using those terms and acknowledging those facts. Even Plaintiffs, who resisted the title Sales Representative, admitted that the employees whom they are seeking to represent all worked in either a Medicare <u>Sales</u> Department or a Medicaid <u>Sales</u> Department. (Aponte depo. 48-49; Correa depo. 76; <u>see also</u> Alcantara depo. 25; Rincon depo. 46) They were assigned to teams, referred to as "<u>sales</u> teams." (Aponte depo. 48) They reported to a Sales Manager, who reported to a Director of Sales, who in turn reported to the Vice President of Sales and Marketing. (Aponte depo. 53; Correa depo. 79-81. <u>See also</u> **Appendix 15**, Deposition of Leisha Doherty ("Doherty depo."), at 8, 11-12; Fernandez depo. 59; Merced depo. 13)

The fact is that at different times and in different locations, the employees responsible for making sales for CHMI were referred to by different titles, including "Sales Representative" and "Benefit Consultant." (Beck depo. 83-84; **Appendix 16**, Deposition of Mary Solomon ("Solomon

6

depo."), at 10; **Appendix 17**, Deposition of Yahely Merced ("Merced depo."), at 6-7; **Appendix 18,**
Johanna Giordano Declaration ("Giordano Decl."), at ¶ 4; **Appendix 19** Gwen Knight Declaration
("Knight Decl."), at ¶ 5)   However, regardless of the time or location, CHMI has consistently
identified and referred to these employees as "Sales Associates."   (Beck depo. 8, 10-11, 83-84)
Accordingly, throughout Defendant's Opposition the employees at issue will be referred to as "Sales
Associates."

IV.   **WHILE SALES ASSOCIATES' PRIMARY DUTY IS SELLING WELLCARE**
**HEALTH PLANS, THE MANNER IN WHICH THEY DO SO VARIES**
**SIGNIFICANTLY**

Regardless of how they prefer to refer to themselves, the Plaintiffs as well as the
additional Opt-Ins have acknowledged in their depositions that their primary duty was to make sales
by enrolling eligible prospects into WellCare Medicare or Medicaid health plans offered by CHMI.
(Aponte depo. 30-31; Correa depo. 21-25, 35-38; Alcantara depo. 27-28[2]; Rincon depo. 47-48, 53-
57, 74; Fernandez depo. 23-24, 56, 65)   However, as detailed later in this Opposition, their deposition
testimony also highlights that the way in which they performed their job duties and responsibilities
varied significantly depending on the product they sold, the geography in which they sold it, the time
period, and/or their supervisor.

Specifically, as the Plaintiffs described their job, they approached prospects, in some
cases walking up to pedestrians on the streets, asked the prospects if they were eligible for Medicare
or Medicaid, and if so, they then explained the advantages of the WellCare health plan products, with
the goal of getting the prospect to sign an enrollment form and enroll in a WellCare health plan.
(Aponte depo. 31-37, 41-45; Correa depo. 37-38; see also Alcantara depo. 29-35, 43-44, 53; Rincon
depo. 56-58, 68-72; Fernandez depo. 38-39, 43-48)   Enrolling a prospect into a WellCare health plan

---

[2] Alcantara depo. 28:

Q:   Was your primary duty or primary responsibility at WellCare to make those sales and get those enrollments?
A:   Yes.

was referred to as a "sale," and the process of getting the prospect to sign the enrollment application form was referred to as "closing the sale." (Aponte depo. 57; Correa depo. 19, 32; Alcantara depo. 25-26; Rincon depo. 62-63; Fernandez depo. 76; Doherty depo. 80; Beck depo. 86-87) See also **Appendix 20**, Opt-In Francisca Alcantara's performance evaluation as "Sales Representative": "I go over the extra mile to work every weekend to increase my sales."

As described by the Plaintiffs and several Opt-Ins who sold the same products in New York City, they had sales quotas or sales targets that they were expected to meet, and the primary measure of their job performance was the number of enrollments or "sales" that they made. (Aponte depo. 54-55, 86; Correa depo. 21-23, 81; Alcantara depo. 50, 58; Rincon depo. 48, 50-51, 71; Fernandez depo. 58) Their compensation also was based on the number of enrollments or "sales" that they made. The Medicare Sales Associates in New York City were paid a base salary plus commissions based on the number of sales. (Aponte depo. 50-52; Correa depo. 21-22, 73; Alcantara depo. 26-27, 60; Fernandez depo. 67-68) A copy of the Compensation Plan that applied to Plaintiffs Miguel Aponte and Amado Correa is attached as **Appendix 21**. (Aponte depo. 50-51) The Compensation Plan is replete with references to "sales," and the Plaintiffs confirmed that enrolling someone in a WellCare health plan constituted a "sale." (Aponte depo. 50-52; Correa depo. 77-79) The Plaintiffs' base salaries alone were approximately .$42,000 per year, although base salaries varied based on what products a Sales Associate sold and where and when he was employed. (Correa depo. 73; Beck depo. 14-15) <u>**Including commissions, a number of putative class members, including several of the Opt-Ins, earned more than $100,000 per year.**</u> (Alcantara depo. 61-62; Rincon depo. 65-66; Fernandez depo. 27-28;[3] see also Pinder Decl. ¶ 8; Giordano Decl. ¶ 12; **Appendix 22**, Declaration of Dalvin Ford ("Ford Decl."), at ¶ 14; **Appendix 23**, Declaration of

---

[3]      In addition, Opt-In Maxine Davis made **$142,364** as a CHMI Medicare Sales Associate in 2008. Another Opt-In, Magdeline Rivas, made **$112,326** in 2007.

8

Francisco Umana ("Umana Decl."), at ¶ 16)   In fact, some CHMI Sales Associates in New York, Florida and Illinois made more than **$200,000** in some years.

## LEGAL STANDARD

In the Second Circuit, "[d]istrict courts may set the conditions under which a plaintiff gives notice to fellow employees of the existence of a collective action and the steps they must take if they wish to join the action." Amendola v. Bristol-Myers Squibb Co., 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008) (citing Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 169 (1989)). Normally, the district court will employ a two-stage inquiry to determine if it should certify an FLSA collective action. See Hendricks v. J.P. Morgan Chase Bank, 263 F.R.D. 78, 83 (D. Conn. 2009). Typically, the court will first evaluate whether the proposed class members are similarly situated. Id. If the court determines proposed members are in fact similarly situated, it will conditionally certify the class. Id. At this point, a court will authorize the sending of a notice to potential class members regarding the litigation. Amendola, 558 F. Supp. 2d at 467 citing Lynch v. United Servs. Auto Ass'n, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007). "[A] plaintiff must make only a 'modest factual showing' that she and the other putative collective action members 'were victims of a common policy or plan that violated the law.'" Amendola citing Realite v. Ark Restaurants Corp., 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998). However, where a plaintiff fails to carry his burden of showing that he and other putative class members were victims of a common policy or plan that violated the law, or where a defendant shows either that the potential recipients of the notice are not similarly situated to the plaintiff or that the defendant likely will succeed in proving that the employees are not entitled to overtime compensation, "a court may refuse to authorize notice or postpone deciding the issue pending further discovery and motion practice." Amendola, 558 F. Supp. 2d at 467.

By contrast, the second step "occurs upon completion of discovery." Hendricks, 263 F.R.D. at 83. At that point, "[a] court, often prompted by a motion for decertification by the

defendant, will examine all the evidence then in the record to determine whether there is a sufficient basis to conclude that the proposed class members are similarly situated." Id. (citing Cuzco v. Orion Builders, Inc., 477 F. Supp. 2d 628, 632 (S.D.N.Y. 2007)).

**ARGUMENT**

## I.   PLAINTIFFS' PROPOSED COLLECTIVE ACTION IS OVERBROAD AS PLAINTIFFS ARE NOT SIMILARLY SITUATED TO THE PUTATIVE CLASS MEMBERS

Courts in the Second Circuit have denied collective action certification where it would be necessary to conduct an individualized investigation as to whether categories of employees are similarly situated with one another. See, e.g., Diaz v. Electronics Boutique of America, Inc., No. 04 Civ. 0840E (SR), 2005 U.S. Dist. LEXIS 30382, at *14 (W.D.N.Y. Oct. 13, 2005) ("Although [store managers] share the same job description, their responsibilities, in fact, may differ and thus a highly fact-specific and detailed analysis of each [store manager's] duties is required, making class treatment inappropriate."); see also Hendricks v. J.P. Morgan, 263 F.R.D. 78, 87 (D. Conn. 2009) (denying plaintiff's motion for class certification of "fund accountants" because record demonstrated more differences than similarities among proposed class members such as level of supervisory influence and accounting knowledge).

For example, in Diaz, 2005 U.S. Dist. LEXIS 30382, at **11-14, the court denied conditional certification of an FLSA collective action comprised of Store Managers ("SMs") and Assistant Store Managers ("ASMs") at defendants' retail locations because the SMs and ASMs were not similarly situated. The plaintiffs, a SM and an ASM at a single store in New York, alleged that defendant violated the FLSA by engaging in a "company–wide plan of not paying their employees overtime or other wages for work performed," including by misclassifying the SMs as exempt. Id. at *11. In determining that the plaintiffs and putative class of SMs and ASMs were not similarly situated, the court explained that the defendant operated over 1,400 retail outlets selling video games

10

and software and each outlet varied in size, revenues and staffing. Id. at *14. Accordingly, the SMs and ASMs at each store had differing job duties and policies. Specifically, the court noted that "just as a determination of the lead plaintiff's exempt or non-exempt status requires a detailed factual analysis of his daily activities and responsibilities, so does a determination of every individual SM's exempt or non-exempt status." Id. at *13.

As discussed below, Plaintiffs have failed to show that members of the proposed class are similarly situated. Further, Plaintiffs cannot show they were actually entitled to overtime compensation. Therefore, even at the first step of the Court's inquiry, it should deny conditional certification.

A.   **Different Sales Associates Performed Different Job Duties**

Sales Associates had different responsibilities for generating and following up on sales leads. (Beck depo. 31-32) Plaintiffs Aponte and Correa, who worked in New York City, confirmed that an important part of their job was to generate sales leads, and to then follow up on those leads by meeting with the prospects and trying to enroll them in a Medicare health plan. (Aponte depo. 31-32; Correa depo. 24-26; see also Alcantara depo. 28-29; Rincon depo. 54-55, 73) At least some of the Opt-Ins in New York City relied heavily on leads from doctors' offices. They would receive telephone calls from a doctor's office informing them that they had a patient in the office who was eligible for Medicare but not enrolled in a private Medicare health plan, and the Medicare Sales Associate would then go directly to the doctor's office to meet with the patient and seek to have the patient sign an enrollment form. (Alcantara depo. 28-30, 41-44, 74; Rincon depo. 95-97) At least some of the Medicare Sales Associates in New York City received leads or referrals from pharmacies and met with customers at the pharmacy when they received a telephone call from the pharmacy informing them that there was a Medicare-eligible customer who may be interested in

11

enrolling in a WellCare health plan. (Aponte depo. 38-39; Alcantara depo. 57-58; Rincon depo. 97-99)

The Plaintiffs, who worked in New York City, testified that they also generated their own leads, by asking the prospects with whom they met for the names of family members and friends who might be interested in enrolling in the WellCare health plan. (Aponte depo. 38-39; Correa depo. 25-26) Opt-In Leisha Doherty, however, confirmed that was not part of the job for Medicare Sales Associates assigned to the Syracuse office.  She did not ask people with whom she met whether they had family or friends who might be interested in a WellCare plan.  (Doherty depo. 72; see also Beck depo. 31-32)  Also, contrary to the experience of the Plaintiffs, Doherty testified that many of the appointments that she had with prospects were set up for her by her supervisor or office personnel. (Doherty depo. 55) The same applied to other Upstate New York Sales Associates.  (See **Appendix 27**, Stephen Lester Declaration "("Lester Decl."), at ¶ 10:  "Earlier on in my employment with the Company, many of the appointments I had with prospects were set up by my supervisor or resulted from leads given to me by other CHMI personnel.")  Also different from the Plaintiffs and Opt-Ins who worked in New York City, some South Florida Sales Associates received sales leads from management and from a telemarketing firm that contracted with CHMI to provide leads and schedule sales appointments for the Sales Associates. (Umana Decl. ¶ 8)

Different Sales Associates performed different job functions identified in the written job description.  Differences in job duties of various Sales Associates also is demonstrated by comparing the job descriptions attached to Plaintiffs' Motion to the Plaintiffs' and Opt-Ins' own deposition testimony about what job duties they did and did not perform. Plaintiffs' Motion argues that all of the putative class members perform the same job duties reflected in the job description, but the deposition testimony confirms that they performed different job duties. For example, the job description lists telemarketing, creating flyers and packets, public speaking, conducting new member

orientations and event planning as part of the job, but the Plaintiffs and/or some of the Opt-Ins did not perform some or all of these tasks. (Aponte depo. 108-09; Correa depo. 82-83; Rincon depo. 74, 76, 77; Doherty depo. 69; Alcantara depo. 63-64; Beck depo. 31-32, 36, 39-43, 50-51, 84-85)

The depositions of the Plaintiffs and Opt-Ins highlight a number of other differences and inconsistencies in their descriptions of their respective job duties and responsibilities, demonstrating the need for a specific, individual-by-individual analysis to determine what that individual's job actually involved and whether the individual satisfies one or more of the tests for exemption from the overtime pay requirements. For example, Opt-In Francisca Alcantara testified that as part of her job she was expected to and did recommend new sales sites and develop new sales sites. (Alcantara depo. 54-55)  The same was true for Opt-Ins Brenda Gonzalez and Maria Nolasco. (*See* **Appendix 24**, 2008 Self-Evaluation by Brenda Gonzalez: "Site Development:  I consistently develop sites in my territory every month.  I am currently the RV 5 captain, which means that I have to look for RV locations and help develop those sites." See also **Appendix 25**, 2008 Self-Evaluation by Maria Nolasco: "Site Development:  [M]y team in RV 16 produces more sales than any other RV team in New York!")

Recommending and developing new sales sites requires the exercise of significant initiative, discretion, and independent judgment, all of which is relevant in evaluating whether an employee qualifies for the administrative employee exemption. 29 C.F.R. § 541.202. In the exercise of her discretion and independent judgment, Alcantara recommended parking an RV outside a particular church on Sundays to take advantage of the pedestrian traffic coming to and from the church. (Alcantara depo. 53-56) Alcantara set up a table on the sidewalk outside the church, with WellCare promotional materials and give-aways designed to attract prospects. Alcantara approached people on the street in front of the church and solicited them to enroll in a WellCare health plan.

Plaintiffs, however, denied that part of their job was to recommend and develop new sales sites. (Aponte depo. 60; Correa depo. 31)

Some Sales Associates engaged in telemarketing, but others did not. The Plaintiffs testified that they did not participate in telemarketing campaigns. (Aponte depo. 109; Correa depo. 83) In contrast, Upstate New York Opt-In Leisha Doherty testified that she regularly was given a list of sales leads by the office and that on a daily basis she telephoned people on the list to see if they were interested in a WellCare health plan. (Doherty depo. 24-26) Some other Sales Associates, depending on what products they sold and where they were employed, also regularly engaged in various types of telemarketing. (Umana Decl. ¶ 8; Knight Decl. ¶ 8) Other Opt-Ins testified that was not part of their job and that they did not engage in telemarketing. (Fernandez depo. 67) In some markets, Sales Associates were specifically prohibited from engaging in telemarketing. (Beck depo. 53) That also was something that changed over time. (Beck depo. 46-47; Solomon depo. 50-52)

## B.    Sales Associates Spent Different Amounts Of Time In A CHMI Office

An important factor to consider under the outside sales exemption is the amount of time an employee spends in his employer's office. 29 C.F.R. §541.502. The testimony of the Plaintiffs and Opt-Ins reflect substantial differences in the amount of time that Sales Associates spend in CHMI offices. Plaintiffs, who worked in New York City, confirmed that they did not work in an office or any CHMI facility. (Aponte depo. 67; Correa depo. 26, 57-58) Instead, they met and enrolled prospects in various locations outside the office, including on the street, at the homes of prospects, outside churches, outside banks, at pharmacies, at doctors' offices, at community centers, and at parades, fairs and other community events. After their initial training, they rarely even entered a CHMI office, only a few times a year. (Aponte depo. 31, 39-42, 74; Correa depo. 24-26, 46-56) With respect to that important issue, the job of the Plaintiffs was different from that of some of the Opt-Ins and putative class members. For example, Opt-In Leisha Doherty testified that the job was

different in the Syracuse, New York office, as opposed to in New York City. Doherty testified that she and the other Medicare Sales Associates assigned to the Syracuse office went to that office every day, beginning each day in the CHMI office and often spending a good part of the day working in the office, meeting with prospects, telephoning prospects, and completing paperwork. (Doherty depo. 45-46, 48-49)

### C.    Different Sales Associates Worked At Different Types Of Locations

Plaintiff Amado Correa testified that he worked outside an RV every day. (Correa depo. 69, 105) Some of the other Medicare Sales Associates in New York City also worked out of RVs, which sometimes moved to several different locations during the course of a single day, with the goal of finding locations with the most pedestrian traffic. (Alcantara depo. 69-70; Aponte depo. 65-66; Fernandez depo. 43-45) In contrast to the Plaintiffs, Opt-In Leisha Doherty, who worked as a Medicare Sales Representative in Syracuse, New York, testified that only approximately 1% of the sales/enrollments that she made were from people she encountered on the street outside an RV. (Doherty depo. 66-67) Many Sales Associates, in particular Sales Associates outside New York City, never or rarely worked out of an RV. (See Pinder Decl. ¶ 7; Ford Decl. ¶ 12; Knight Decl. ¶ 13; **Appendix 26,** Raymond Pinkerton Declaration ("Pinkerton Decl."), at ¶ 20; Lester Decl., ¶ 13; Merced depo. 21. See also Beck depo. 45-46: "Part of it is based on geography. When I think about the way we sell in Downstate NY it is totally different than the way we sell in Upstate New York just due to the concentration of eligibles there.")[4]

### D.    Some Sales Associates Engaged In Street Sales, But Others Did Not, And This Changed Over Time

Plaintiffs described the type of "street sales" that they engaged in, that was typical in Hispanic neighborhoods in New York City during certain periods of time but was not engaged in by

---

[4]    See also Beck depo: 71-72: "Some BCs would do RV storefront presentations, right; some would not. Some would do formal sales events; some would not."

many other Sales Associates who worked at locations outside New York City. Aponte and Correa regularly worked at locations where there was a high volume of pedestrian traffic, and they approached pedestrians on the street and solicited them to enroll in a WellCare Medicare health plan. If the individuals they approached were interested, they gave them a full-blown sales presentation and completed the sale on the spot, by filling out the enrollment form and having the individual sign the enrollment form on the spot. (Aponte depo. 31-37, 42-43; Correa depo. 35-38, 46-48) In contrast, many Sales Associates, in particular Sales Associates outside New York City, never engaged in street sales. (Pinder Decl. ¶ 7; Ford Decl. ¶ 12; Knight Decl. ¶ 13)

Plaintiffs also admit that even within their own limited sales territory, things changed over time, mostly as a result in changes in the laws governing the sale of Medicare products. Prior to October 2008, CHMI's New York City Sales Associates regularly approached pedestrians on the street and solicited them to enroll in a WellCare health plan. (Aponte depo. 31-37, 42-43; Correa depo. 35-38, 46-48; Alcantara depo. 41; Rincon depo. 11-12, 68-71) However, after October 2008, the Sales Associates had to rely on give-aways to attract pedestrians to the tables they set up on the sidewalks because they had to wait for a pedestrian to approach them before soliciting the pedestrian to enroll in the WellCare health plan. (Aponte depo. 43, 45; Correa depo. 35-36, 40-41, 100) According to Amado Correa, "It was a big change" in the way he went about performing his job after October 2008. (Correa depo. 42-44; see also Beck depo. 46: "Over time, given changes in CMS regulations and the implementation of MIPPA, that's caused changes in the way we sell . . . .") On the other hand, in certain other locations outside of New York, Sales Associates could and still did engage in street sales where they approached pedestrians on the street and completed the sale on the spot. For example, Medicaid Sales Associates in Chicago were not covered by the same regulatory requirements that applied to Medicare Sales Associates in New York, and many of them continued to approach and solicit pedestrians on the street after 2008. (Beck depo. 48, 85-86)

**E.**   **The Nature And Levels Of Supervision Varied Among Sales Associates**

In assessing whether an employee qualifies for exemption from the overtime pay requirements, the extent to which the employee works independently, without direct supervision is one of the factors considered.   29 C.F.R. §541.202.   The Plaintiffs' deposition testimony demonstrates that as yet another area in which there were substantial differences among the Sales Associates.  The Plaintiffs who worked in New York City confirmed that they worked without direct supervision. They made their presentations to prospects and had prospects sign the enrollment forms in one-on-one meetings with the prospect, and they were not accompanied by a supervisor. They saw their supervisor only occasionally. (Aponte depo. 36-37, 42, 44; Correa depo. 61-62; <u>see</u> <u>also</u> Alcantara depo. 50[5])   Leisha Doherty, an Opt-In who worked in Syracuse New York, described a significantly different level of supervision.  According to Doherty, she and other Sales Associates who worked in Onondaga County, New York were frequently accompanied by a supervisor on appointments with prospects, and they met face-to-face with their supervisor on a daily basis. (Doherty depo. 45-46, 53-54)

**F.**   **Different   Compensation   Policies   And   Structures   Applied   To   Different Individuals**

In analyzing the applicability of the outside sales exemption, the manner in which employees are compensated for their work is an important consideration.  Plaintiffs testified that they were paid according to a prototypical salesperson compensation plan, with a base salary plus commissions based on the number of sales that they individually made.  (Aponte depo. 50-52; Correa depo. 21-22, 73)  A copy of the Compensation Plan that applied to them is attached as **Appendix 21**. The Compensation Plan is replete with references to "sales," and Plaintiffs confirmed that enrolling someone in the WellCare health plan constituted a "sale." (Aponte depo. 50-52; Correa depo. 77-79)

---

[5]   Alcantara depo. 50:

Q. So when you were making your sales presentations, you did that one-on-one with your customer?
A. One-on-one with my customer.

Base salaries alone were generally $42,000 per year. (Correa depo. 73) Including commissions, a number of putative class members, including several of the Opt-Ins, earned more than $100,000 per year.   (Alcantara depo. 61-62; Rincon depo. 65-66; Fernandez depo. 27-28)   However, the Compensation Plan that applied to Plaintiffs did not apply to some Opt-Ins and the majority of putative class members. The way in which Sales Associates were compensated varied depending on what products they sold, where they worked, and when they were employed.

  Different compensation policies based on the nature of the products sold.  Some of the Opt-Ins who worked as Medicare Sales Associates testified that, in addition to a base salary, they also were paid commissions based on the number of sales they made. (Alcantara depo. 61-62; Rincon depo. 65-66; Fernandez depo. 27-28)  However, at least some Sales Associates who sold Medicaid products were not paid commissions. (Beck depo. 25)  Medicaid Sales Associates also generally were paid substantially lower base salaries than Medicare Sales Associates. (Beck depo. 77)

  Different compensation policies depending on where the individual worked.  The way in which Sales Associates were compensated varied not only based on the products sold, but also depending on where the Sales Associates worked. For example, Medicaid Sales Associates in New York are not paid variable compensation based on the number of sales they make. They may be eligible for a bonus, but sales production is only one of several factors that must be considered, and compensation cannot be tied directly to the number of sales. (Beck depo. 21-22, 25)  In contrast, Medicaid Sales Associates who work in Illinois are paid variable compensation based directly on the number of sales they make. (Beck depo. 21-22) CHMI no longer employs Medicaid Sales Associates in Florida, but when it did (prior to 2009), they were covered by a different compensation plan under which they received variable compensation based on sales. (Beck depo. 21-23)

  New York Medicaid Sales Associates also were different from Medicaid Sales Associates in other states because there were strict limits on the amount of bonuses New York

Medicaid Sales Associates would receive. In particular, their bonuses could not exceed 10% of their base salaries. (Beck depo. 23)  That restriction did not apply to other Sales Associates. Indeed, some other Sales Associates received bonuses or commissions that were more than 100% of their base salaries. (Alcantara depo. 61-62; Rincon depo. 65-66; Fernandez depo. 27-28)

Another example of differences in compensation even among employees who sold the same products is that Medicaid Sales Associates in Illinois are eligible for a separate "book of business" bonus that impacts their base salary. (Beck depo. 26) Medicaid Sales Associates in New York, in contrast, are not eligible for any similar bonus.  The compensation plans for Sales Associates also vary from state to state. (Beck depo. 18) Moreover, the compensation plan for Medicare Sales Associates in Upstate New York is different from the compensation plan for Medicare Sales Associates in New York City. (Doherty depo. 76-77; Beck depo. 18)

Different compensation policies depending on when the individual worked. Compensation policies varied not only based on the nature of the product sold and where the Sales associate worked, but also based on when he or she was employed.  Compensation plans changed at least annually, so a Sales associate employed in 2007 was paid differently than a Sales Associate employed in 2010, even if they sold the same product in the same market.  (Beck depo. 18, 27)

G.    **The Existence And Nature Of Sales Targets Varied**

Another indicia of an exempt outside salesperson is the existence of sales quotas or targets.  Plaintiff Aponte testified that he had specific sales targets that he was expected to meet, and the primary measure of his job performance was the number of enrollments or "sales" that he made. (Aponte depo. 54-55, 86; see also Alcantara depo. 50, 58; Rincon depo. 48, 50-51, 71)

However, this is another respect in which not all Sales Associates were similarly situated.  Not all Sales Associates had the type of sales targets that applied to Plaintiff Aponte.  At least in some markets, depending on the products that they sold, Sales Associates did not have

specific sales targets.  And in some markets, because of particular state and/or local regulatory requirements, sales production was not weighted as heavily in evaluating a Sales Associates job performance.  (Beck depo. 23-25)

Where Sales Associates had specific sales quotas or target, they varied significantly from market to market.  For example, when CHMI had Medicaid Associates in Florida, they had a sales target of 30 enrollments per month, while a Medicaid Sales Associate in Illinois was expected to make 100 enrollments/sales per month.  (Beck depo. 24) Even within the same market and same product segment, the nature of level of sales targets varied over different periods of time.  (See New York City 2007 sales targets (**Appendix 21**) and New York City 2008 sales targets (**Appendix 32**))

### H.   Different Legal Issues Apply To Different Individuals

A different exemption will be at issue with respect to some individuals.  While Defendant is confident that its Sales Associates are exempt outside sales employees, for individuals who argue that their jobs involved marketing and promotion rather than sales, there will be additional and different legal issues that will need to be decided.  In particular, for those who argue that they did not make sales, there will be separate legal issues relating to whether they qualify for the administrative employee exemption, which is significantly different from the outside sales exemption and raises a host of different legal and factual issues.  Compare 29 C.F.R. §541.200 and 29 C.F.R. §541.500.

There will be different legal and factual issues based on the amount of compensation an individual employee received.  There are also wide variations in the amount of compensation that individual Sales Associates received. For example, in 2008, the two Plaintiffs received total annual compensation of approximately $41,832 (Aponte) and $78,689 (Correa). On the other hand, as indicated above, many Sales Associates were paid more than $100,000 per year, and in fact, some made more than $200,000 per year.  Plaintiffs are not similarly situated to, or representative of, other

20

Sales Associates who were paid more than $100,000 per year. The FLSA contains a special exemption for employees whose annual compensation exceeds $100,000.  29 C.F.R. § 541.601. Accordingly, for those Sales Associates whose annual compensation exceeded $100,000, there will be a host of additional and different legal and factual issues.

<u>Some former Sales Associates signed releases, and others did not.</u>  At various times, CHMI has had reductions in force that resulted in the termination of a significant number of Sales Associates. In connection with those reductions in force, and also under other circumstances, many former Sales Associates, including Opt-In Ruben Mercedes, signed separation agreements that waived and released a variety of employment-related claims.  (<u>See</u> **Appendix 28**, signed release for Opt-In Ruben Mercedes)  Accordingly, for those former Sales Associates who signed such releases, there will be additional and different factual and legal issues relating to their waiver of claims for overtime pay under the New York Labor Law.  <u>See</u>  <u>DiFilippo et al., v. Barclays Capital, Inc.</u>, 552 F. Supp. 2d 417, 426-27  (S.D.N.Y. 2008) (employees may validly waive their overtime rights under the New York Labor Law) (<u>citing</u> <u>Simel v. J.P. Morgan Chase</u>, No. 05 Civ. 9750, 2007 U.S. Dist. LEXIS 18693, at *2 (S.D.N.Y. Mar. 19, 2007)).  There also are separate legal issues relating to the effect of those releases on claims under the FLSA, and if it is determined that the releases do not completely bar claims under the FLSA, there will be additional issues relating to the set-off of the monetary consideration they received for the releases against any amounts that they may be owed based on the claims asserted in this case.

**I.**     **The Lin Lawsuit Does Not Support Plaintiffs' Motion For Conditional Certification**

Plaintiffs' Motion (pp. 15-16) refers to a prior lawsuit before this Court, <u>Liam Lin, et al. v. Comprehensive Health Management, Inc.</u>, and suggests that the mere existence of that prior lawsuit somehow supports certifying this action as a collective action.  The <u>Lin</u> case, however, involved a very narrow group of Sales Associates, and rather than supporting collective action

21

certification, the <u>Lin</u> case further highlights how different Plaintiffs Aponte and Correa are from other Sales Associates.  For example, all of the plaintiffs in the <u>Lin</u> case were Chinese-speaking Medicaid Sales Associates who sold almost exclusively to non-English-speaking Chinese immigrants in Chinatown and other predominately Chinese neighborhoods of New York City.

In contrast, Plaintiffs Aponte and Correa admit that they only sold Medicare products and did not solicit or enroll people in Medicaid health plans. (Aponte depo. 71-72; Correa depo. 87) They also admit that Medicaid Sales Associates were compensated differently and had different compensation plans. (Correa depo. 88; <u>see also</u> Alcantara depo. 67; Rincon depo. 89, 91) Plaintiffs further admitted that they did not know anything about the enrollment process for a Medicaid health plan or what a Medicaid Sales Associate's job involved. (Aponte depo. 71-72; Correa depo. 89-91)

### J.    Other Differences Between Sales Associates

<u>Different Selling Periods.</u>  The time periods during which Sales Associates could engage in certain sales activities and enroll new members in a health plan also varied depending on where the Sales Associate was employed and what products he/she was authorized to sell. That also varied over time, based on changes in government regulations and Company policies. (**Appendix 29,** **Robert Freeman Declaration ("Freeman Decl."), at ¶ 17)** For example, there is a limited Annual Enrollment period applicable to Medicare plans, but individuals generally can be enrolled in Medicaid plans throughout the year. (Frazer depo. 26) There also are significant differences based on the geographic market. For example, in Illinois there are no lock-in periods applicable to Medicaid beneficiaries, so a Medicaid Sales Associate can solicit individuals to enroll in a WellCare plan even if they are currently enrolled in another plan. In contrast, in New York, a Medicaid Sales Associate cannot solicit someone who is already enrolled in another plan. (Beck depo. 48)

<u>Different Territorial Restrictions.</u>  The geographic area within which different Sales Associates can engage in sales activities also varies. For example, a Medicare Sales Associate in

New York is limited to selling in a single county. (Doherty depo. 9-10)  A Medicaid Sales Associate in New York on the other hand, is not limited to selling in a particular county. (Frazer depo. 28-29) In other states, such as Louisiana, Texas and Florida, CHMI's Medicare Sales Associates can sell anywhere within the state or market where they are licensed.  (Ford Decl. ¶ 7; Knight Decl. ¶ 7; Umana Decl. ¶ 7)

        <u>Differences In The Nature And Amount Of Non-Sales Activities</u>.   Apropos the outside sales exemption, on an individual-by-individual basis, there will be issues concerning how much time the individual employee spent performing non-sales work.  29 C.F.R. §541.500. Although CHMI has a completely separate Customer Service Department with a dedicated Customer Service staff to assist existing members in their health plans, some of the Opt-Ins argue that they performed customer service work and other work that they claim did not involve making sales. (Alcantara depo. 16)  This is yet another aspect in which the Plaintiffs are not similarly situated to or representative of all other Sales Associates, and in which the nature and amount of the worked performed varied from individual to individual. (Fernandez depo. 37, 78;[6] Beck depo. 35-36)

## K.    <u>The Foregoing Differences Would Require An Individualized Investigation</u>

        When claimants are not similarly situated and individualized inquiries predominate, as they do in this case, courts have refused to approve sending notice of a collective action. <u>Dean v. Priceline.Com, Inc.</u>, 00 Civ. 1273, 2001 U.S. Dist. LEXIS 24982, at *7 (D. Conn. Jun. 5, 2001).  In <u>Dean</u>, the plaintiff requested that he be allowed to send notice of an FLSA collective action to all

---

[6]   Fernandez depo. 78:

    Q: Other than making sales and enrolling people in the plan, did you do any other type of work at WellCare?

    A: No, everything, my job was everything that has to do with promoting the company.

    Q: When you say the company, you mean the Medicare sales product?

    A: The Medicare…

    Q: Excuse me, the Medicare product?

    A: Yes.

other employees who were not paid overtime wages. 2001 U.S. Dist. LEXIS 24982, at *5-6.   The plaintiff argued that the putative class members were similarly situated because all were denied overtime pay as a result of being misclassified as exempt.  The court declined to authorize notice, finding that collective treatment of the action was inappropriate as "[d]etermining whether an employee is exempt is extremely individual and fact intensive, requiring a careful factual analysis of the full range of the employee's job duties and responsibilities." Id.[7]

Plaintiffs' factual allegations regarding their own limited personal experiences are insufficient to justify the size and scope of Plaintiffs' requested collective action group. Recently, in Guillen v. Marshalls off MA, Inc., 09 Civ. 9575 (LAP)(GWG), 2010 U.S. Dist. LEXIS 121419 (S.D.N.Y. Nov. 18, 2010), the Court denied the plaintiff's motion for conditional certification of a nationwide class of defendant's assistant store managers who alleged they were required to perform non-exempt tasks without being compensated for overtime. In denying conditional certification, the Court noted the plaintiff presented scant evidence that consisted only of "affidavits from five [assistant store managers] who experienced the allegedly illegal activities at nine of the 820 [defendant's] stores nationwide." Id. at 19. Further, all of these stores were located in the New York City metropolitan area. Additionally, the Court pointed out that the plaintiff "stated in his deposition that he ha[d] no personal knowledge about how stores, other than those at which he was an employee, operated." Id. As such, the Court ruled "the fact that [assistant store managers] were responsible for performing non-exempt tasks in contravention of their written job requirements in nine stores in a particular metropolitan area, out of 820 stores nationwide, provides little basis to believe that [plaintiff] is similarly situated to [assistant store managers] throughout the country with

---

[7]   Moreover, the case at hand is readily distinguishable from cases such as Davis v. Abercrombie & Fitch Co., 08 Civ. 1859 (PKC), 2008 U.S. Dist. LEXIS 86577 (S.D.N.Y. Oct. 22, 2008) (granting plaintiffs' motion for conditional certification). In Davis, all putative class members occupied the same position (Loss Prevention Agents) and worked in the same geographic region (New York/New Jersey). Unlike the case at hand, it did not involve a nationwide putative class comprised of employees with different job titles and functions who were governed by different regulatory requirements and compensation plans.

respect to his claim regarding [assistant store manager] job responsibilities." Id. See, e.g., Eng-Hatcher v. Sprint Nextel Corp., 07 Civ. 7350 (BSJ), 2009 U.S. Dist. LEXIS 127262, at *17 (S.D.N.Y. Nov. 13, 2009) (ruling plaintiff's "attempts to impute her own limited experience to a nationwide class" were insufficient to justify her proposed class). See, e.g., Anglada v. Linen 'N Things, Inc., 06 Civ. 12901 (CM)(LMS), 2007 U.S. Dist. LEXIS 39105, at *16-19 (S.D.N.Y. Apr. 26, 2007) (recommending denial of plaintiff's motion for collective action certification of a nationwide class where plaintiff "offer[ed] no supporting declarations or affidavits from other similarly situated employees who are located at any other [defendant's] store, and aver[ed] no personal knowledge of the policies or practices of any [defendant's] store other than the two stores in which he worked"); Morales v. Plantworks, Inc., 05 Civ. 2349 (DC), 2006 U.S. Dist. LEXIS 4267, at *5-6 (S.D.N.Y. Feb. 2, 2006) (denying collective action certification because plaintiffs' evidence "contain no reference to any [defendant's] employee other than plaintiffs, and they make no allegations of a common policy or plan to deny plaintiffs overtime").

Further, in Monger v. Cactus Salon & Spa's LLC, 08-CV-1817 (FB)(WDW), 2009 U.S. Dist. LEXIS 60066 (E.D.N.Y. July 6, 2009), plaintiffs, who were both employed at the South Oyster Bay Road Salon, brought several wage-hour violations against their employer, and sought to conditionally certify employees at the employer's 25 salon locations. Plaintiffs submitted affidavits stating they believed the other salons' employees were subjected to the same wage-hour violations. In denying plaintiffs' motion, the Court held that the "plaintiffs' evidence [was] insufficient to justify a class certification of either overtime or minimum-wage claims on behalf of Cactus Salon employees at locations other than South Oyster Bay Road." Monger v. Cactus Salon & Spa's LLC, 2009 U.S. Dist. LEXIS 60066, at *5. The Court further stated that "[p]laintiffs' only evidence that other locations' employees are similarly situated is that they "believe" that all hair stylists and shampoo assistants are subject to the same policies. They offer no basis for this belief; **they name no**

25

individuals at other salons who are similarly situated; and they provide no documentary evidence that policies are the same at different Cactus Salon locations." Id. (emphasis added). Consistent with the holdings in the cases discussed above, given the breadth of the proposed collective action group, and Plaintiffs' scant and unsupported allegations, certification on a nationwide basis is inappropriate.

## II.   PLAINTIFFS' CONCLUSORY AND UNSUPPORTED ALLEGATIONS ARE INSUFFICIENT WITH RESPECT TO EITHER PHASE OF THE COURT'S INQUIRY

Despite the liberal pre-discovery standard to assess whether employees are similarly situated with one another, "conclusory allegations or lack of a nexus with the putative class will prevent the case from moving forward as a collective action." Mendoza v. Casa De Cambio Delgado, Inc., No. 07 Civ. 2579 (HB), 2008 U.S. Dist. LEXIS 27519, at *4 (S.D.N.Y. Apr. 7, 2008). Additionally, a "Court will not find that putative class members are similarly situated based solely on plaintiffs' allegations that defendants committed widespread wrongdoing if there is a total lack of factual support for those allegations." See Ayers v. SGS Control Services, Inc., No. 03-civ-9078 (RMB) (RLE), 2004 U.S. Dist. LEXIS 25646, at *15 (S.D.N.Y. Dec. 16, 2004). Such a finding is especially true where "[t]he affidavits by the former employees appear to be boilerplate and virtually identical." Mendoza, 2008 U.S. Dist. LEXIS 27519, at *6. In this case, the Court should deny Plaintiffs' Motion because Plaintiffs have provided nothing more than self-serving and conclusory allegations suggesting that collective treatment is appropriate, and their own deposition testimony directly undermines and contradicts those self-serving and conclusory allegations.

### A.   The Conclusory And Unsupported Declarations Offered By Plaintiffs' Motion Are Contradicted By The Deposition Testimony Of The Plaintiffs And Opt-Ins

Plaintiffs' Motion relies largely on cookie-cutter Declarations from the Plaintiffs and Opt-Ins. Those Declarations make completely unsupported and conclusory allegations that other Sales Associates were similarly situated. Not only are those Declarations unsupported, they are

directly contrary to the sworn deposition testimony of the Plaintiffs and Opt-Ins.  The Plaintiffs and Opt-Ins who worked in New York City confirmed that their experience and knowledge was limited to Medicare in New York City and that they did not know about the job of Sales Associates who worked in other places or sold other products.  For example, Plaintiff Aponte testified that he was assigned to work exclusively in New York City, that he never went to any office outside New York City, and that he does not know anything about the job duties of Medicare Sales Associates in other states, in Upstate New York, or even other parts of New York City.  (Aponte depo. 67- 70, 78[8]) Aponte also testified that he only met a Medicaid Sales Associate on two occasions, and that he knows nothing about a Medicaid Sales Associate's job other than that there are different rules and regulations that apply to their jobs. (Aponte depo. 71-72[9])  Plaintiff Correa and the Opt-Ins similarly testified that their knowledge is limited to their narrow geographic territory and that they do not know anything about the jobs of Medicare Associates who worked in other states or other parts of New York or Sales Associates who sold other products, even in the same areas where they worked. (Correa depo. 87, 90[10]; Alcantara depo. 63-67[11]; Doherty depo. 74-75, 94; Fernandez depo. 66, 68)

---

[8] Aponte depo. 70:
    Q: All you know about is how you and the other reps in the Bronx went about doing your job: correct?
    A: Bronx, Manhattan, Brooklyn, yes.
  Aponte depo. 78:
    Q. Do you know anything about the reps other than the ones who worked in Manhattan?
    A. Specifically, no.
[9] Aponte depo. 72:
    Q: So you can't tell me about Medicaid?
    A: No.
[10] Correa depo. 87:
    Q: Do you know anything about the Medicare reps in locations other than New York City?
    A: No.
  Correa depo. 90:
    Q: Do you know anything about that, the Medicaid reps?
    A: No.
[11] Alcantara depo. 65:
    Q: Do you know anything about the jobs of people outside New York City?
    A: No

**B.**     **Plaintiffs' Motion Misinterprets Selected Excerpts From CHMI's Medicare Sales Compliance Training Materials**

Plaintiffs' Motion attaches as Exhibit X excerpts from "WellCare Sales Compliance Immersion Training" dated September 1, 2009, and argues that somehow supports [class] certification by demonstrating that certain practices were standard throughout the Company. That document in no way supports Plaintiffs' argument. First, the document and the practices addressed relate exclusively to Medicare only. (Beck depo. 57-58, 80-82) Second, the practices addressed in the document did not go into effect until 2010, long after the Plaintiffs' employment with CHMI ended. (Beck depo. 61, 63-64, 67-68) Third, the practices addressed in the document relate primarily to how the Medicare Sales Managers were expected to manage their operations, and not the types of issues that impact the primary duties of a Medicare Sales Associate and their eligibility for overtime pay. (Beck depo. 53-54, 57-59)

In reality, different Sales Associates received different training, depending on what products they sold, where they worked, and when they were employed. (Merced depo. 4, 7-9, 15-16; Solomon depo. 46; **Appendix 30,** Deposition of Eugene Tuff ("Tuff depo."), at 9, 19-22) According to the Plaintiffs, training also varied among Sales Associates who sold the same products, and worked in the same market at the same time. Plaintiff Aponte and some of the Opt-Ins confirmed that they received significant Medicare Sales Training from CHMI. (Aponte depo. 111; Rincon depo. 62) Some acknowledge receiving training that included mock sales presentations and instruction on various sales techniques and how to "close" a sale. (Rincon depo. 62-65; see also Medicare sales training memorandum, attached as **Appendix 31**)  However, this is another area in which the deposition testimony differed, because Plaintiff Correa and at least one Opt-In testified that they did not receive sales training at CHMI. (Correa depo. 84, 92-93; Alcantara depo. 51)

28

**III.    DEFENDANT WILL SUCCEED IN SHOWING PLAINTIFFS ARE NOT ENTITLED TO OVERTIME COMPENSATION BECAUSE OF THE OUTSIDE SALES EXEMPTION**

At least one court within the Second Circuit has held that a collective action is improper where a defendant demonstrates it "will likely succeed at trial in proving that the employees are not entitled under the FLSA to overtime compensation." Amendola v. Bristol-Myers Squibb Co., 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008). When such a situation arises "a court may refuse to authorize notice or postpone deciding the issue pending further discovery and motion practice." Id. The Amendola Court "scrutinize[d] the merits based on the record developed to date by the parties and to the extent necessary to address this motion for authorization of notice." Id. at n.9. In denying the plaintiffs' motion for authorized notice, the Court determined the employees in question were likely within the ambit of the FLSA's administrative exemption.

Courts in other Circuits have denied plaintiffs' motions for conditional class certification based on the defendant's showing that the outside sales exemption to the FLSA applies. In Olivo v. GMAC, 374 F. Supp. 2d 545 (E.D. Mich. 2004), the Court deemed a collective action to be inappropriate based on the outside sales exemption because the loan officers in question "work[ed] primarily outside of the office to solicit prospective borrowers and referral services." Id. at 550. The defendant submitted various declarations of loan officers which indicated that they "spend a substantial percentage of time outside of the office soliciting sales and generating or maintaining contacts, and that much of the time spent at the office is devoted to following up on contacts and leads generated during outside sales visits." Id. at 551. Based on this evidence, the Court ruled the outside sales exemption applied and thus, the plaintiffs were "unable to demonstrate that they, and the potential plaintiffs, were 'victims of a common policy or plan that violated the law,' and, therefore that [p]laintiffs…[failed] to demonstrate that they [were] 'similarly situated' to other…loan officers…." Id. at 551.  See also Clausman v. Nortel Networks, 02-0400-C-M//S, 2003 U.S. Dist.

29

LEXIS 11501 (S.D. Ind. May 1, 2003) (granting motion to withdraw order approving notification of lawsuit to potential class members based on inter alia, whether potential plaintiffs were properly classified as outside salespersons); see also Evancho v. Sanofi-Aventis, 07-2266 (MLC), 2007 U.S. Dist. LEXIS 93215 (D.N.J. Dec. 19, 2007) (denying motion for conditional collective action certification of pharmaceutical representatives after showing that some may have fit within the outside sales exemption thereby requiring a fact-specific inquiry). As clearly set forth above, CHMI's Sales Associates are outside salespersons exempt from the overtime provisions of the FLSA.

**IV.    IF THE COURT GRANTS CONDITIONAL CERTIFICATION, PLAINTIFFS' PROPOSED NOTICE IS DEFECTIVE**

**A.    The Notice Should Have A Two, Rather Than Three, Year Window**

If the Court is inclined to grant conditional certification, the notice should have a two year window from the date notice is issued. The period does not begin on the date the Complaint was filed, contrary to Plaintiffs' misguided request. The statute of limitations under the FLSA is two years, unless the employers' violation is willful, in which case it is three years from the date each individual files an opt-in form. 29 U.S.C. § 255(a). A violation of the FLSA is deemed willful only where the "employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." See McLaughlin v. Richland Shoe Com, 486 U.S. 128, 133 (1998). Plaintiffs who seek to invoke the three year limitations period carry the burden of showing that the employer's alleged violation was willful. See Walton v. United Consumers Club, Inc., 786 F.2d 303, 308 (7th Cir, 1986). Plaintiffs' Motion does not argue that Defendant's alleged violations of the FLSA were willful and lacks facts to support such a claim.[12]   Accordingly, notice should be limited

---

[12]   Employers in the managed care industry classify employees in similar sales roles as exempt. For example, Plaintiff Aponte and the Opt-Ins had health plan sales experience prior to CHMI, and they also continued working in a similar sales role for CHMI's competitors after their employment with CHMI ended. (Aponte depo. 9-10; Alcantara depo. 7, 9-13, 17, 22-23; Rincon depo. 10, 27, 29; Fernandez depo. 9-10, 23)  As at CHMI, they were classified as exempt employees while working in similar roles for CHMI's competitors; they were paid a base salary plus commissions based on the number of people they enrolled into the health plan, but they were not paid overtime. (Alcantara depo.13, 23; Rincon depo. 10, 21, 24, 31; Fernandez depo. 20-21)

to the FLSA two year limitation period. (The time period for any notice must be measured from the date of the Court's Order—not from the date the Complaint was filed. Mere filing of a lawsuit does not toll the limitation period until each putative class member files a consent to join the action). <u>See</u> <u>Vaicaitiene v. Partners in Care, Inc.</u>, No. 04 Civ. 9125 (RMB)(THK), 2005 U.S. Dist. LEXIS 13490 (S.D.N.Y. July 6, 2005); <u>Updite v. Delta Beverage Group, Inc.</u>, No. 06-0593, 2006 U.S. Dist. LEXIS 90719, *5 (W.D. La. December 15, 2006).

### B.    The Group Identified To Receive The Opt-In Notice Is Overbroad

Plaintiffs propose to send the Notice to Sales Associates employed by Defendant. This group is overbroad and misleading. As discussed above, Plaintiffs certainly are not similarly situated to Sales Associates employed outside of New York City. In <u>Laroque v. Domino's Pizza</u>, 557 F. Supp. 2d 346, 355 (E.D.N.Y. 2008), the plaintiffs, who worked at a Coney Island store, sought to certify a collective action class consisting of employees who worked at other Brooklyn area stores. While the Court noted the plaintiffs demonstrated they were similarly situated to employees working at the Coney Island store, insufficient evidence existed to reach that same conclusion with respect to the employees at the other Brooklyn area stores. <u>Id</u>.   However, the plaintiffs' proposed notice defined the class as including the employees at the Brooklyn area stores. Sustaining the defendant's objection that this definition was overbroad, the Court modified the notice's content to reference only those employees who worked at the Coney Island store. <u>Id.</u> at 356. Additionally, the Court limited the definition of potential plaintiffs to include only those employees who worked at the Coney Island store.   Based on <u>Laroque</u>, in the event the Court determines that notice should be issued, notice should be circulated to the group of employees who, like Plaintiffs, were employed by CHMI as Sales Associates solely in New York City.

31

**C.**     **The Notice Should Not Be Posted At Defendant's Locations**

The Court also should reject Plaintiffs' intrusive request to post notices about the lawsuit in Defendant's locations nationwide. See Shajan v. Barolo LTD, 10 Civ. 1385 (CM), 2010 U.S. Dist. LEXIS 54581, at *5 (S.D.N.Y. Jun. 2, 2010) (ruling that "[s]ince all current employees will be receiving the notice, there is no need to require defendants to post the notice in the workplace"); Gordon, et al. v. Kaleida Health, et al., 08-CV-378S, 2009 U.S. Dist. LEXIS 95729, at *35-36 (W.D.N.Y. Oct. 14, 2009) ("Moreover, the only group that will be reached by posting are current employees, who have an interest in providing their employer with an up-to-date mailing address. . . . For the reasons stated, I find that first class mail is the 'best notice practicable' and should be sufficient to provide potential class members here the notice to which they are entitled."). In short, posting notices about the lawsuit at Defendant's locations would only serve to harass Defendant.  Moreover, since Defendant's Sales Associates spend so much of their time away from any fixed location, mailing notices to potential class members' homes will be the most effective and efficient way to provide notice of the lawsuit.

**D.**     **Plaintiffs' Proposed Notice Should Be Rejected As Misleading And An Overt Solicitation**

In the interests of balance and fairness, potential opt-ins should be advised that there is no entitlement to overtime pay <u>unless</u> hours actually worked exceed 40 in a workweek (as opposed to sick time, vacation time, meal breaks or other non-work time).  Fairness dictates that Defendant be permitted to describe its position and defenses.  Since this is the first communication that potential Opt-Ins will receive about this lawsuit, it is critical that the Notice contain a balanced disclosure of both parties' positions. See Romero v. Flaum Appetizing Corp., 07 Civ. 7222 (BSJ), 2009 U.S. Dist. LEXIS 80498, at *19 (S.D.N.Y. Aug. 17, 2009) (while denying defendants' request to summarize its defenses in the notice, the Court noted the notice already stated that "defendants have denied that they are responsible for paying the overtime wages claimed or that they engaged in any other

32

violations of the applicable wage and hour laws."); see Belcher v. Shoeney's, Inc., 927 F. Supp. 249, 253 (M.D. Tenn. 1996) (authorizing notice that included statement of employer's affirmative defenses); Belt v. Emcare, Inc., 299 F.Supp. 2d 664, 671 (E.D. Tenn. 2003) (same).  Reference to CHMI's defenses including, but not limited to, that Plaintiffs properly were classified as exempt pursuant to the outside sales exemption, should appear on the first page of the Notice to ensure that the recipients see this critical information.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Conditional Certification of this Case as a Collective Action and Notice to Potential Opt-Ins should be denied.

Respectfully submitted,

/s/ Peter C. Moskowitz
Peter C. Moskowitz, Esq.
Jason A. Zoldessy, Esq.
JACKSON LEWIS LLP
666 Third Avenue
New York, New York 10017
Telephone:  (212) 545-4000
Facsimile:  (212) 972-3213

Emmett F. McGee, Jr., Esq. (admitted *pro hac vice*)
Paul A. Mallos, Esq. (admitted *pro hac vice*)
JACKSON LEWIS LLP
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland  21209
Telephone:  (410) 415-2000
Facsimile:  (410) 415-2001

ATTORNEYS FOR DEFENDANT

Dated:  February 10, 2011

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for Defendant Comprehensive Health Management, Inc, hereby certifies that on this 10th day of February, 2011, the foregoing document was filed electronically with the Clerk of the Court.   Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt including: Andrew Frisch, Esq., Carlos Leach, Esq., Morgan & Morgan, 6824 Griffin Road, Davie, FL 33314, Counsel for Plaintiffs.

/s/ Jason A. Zoldessy
Jason A. Zoldessy
Attorney for Defendant

34